### CITY OF SCRANTON

v.

**FIRE FIGHTERS LOCAL UNION NO. 60, the Pennsylvania Department of Community and Economic Development and the Pennsylvania Economy League Central Pa., LLC, as the Act 47 Coordinator for the City of Scranton**

**Appeal of: The City of Scranton, Pennsylvania and the Pennsylvania Department of Community and Economic Development, and the Pennsylvania Economy League Central Pa., LLC, as the Act 47 Coordinator for the City of Scranton**

**City of Scranton**

v.

**Fire Fighters Local Union No. 60**

**Appeal of: Fire Fighters Local Union No. 60 of the International Association of Fire Fighters, AFL–CIO.**

Commonwealth Court of Pennsylvania.

Argued June 21, 2010.

Decided Oct. 29, 2010.

See also, 964 A.2d 464, 965 A.2d 359, 995 A.2d 1180, and 2010 WL 4261337.

Clifford B. Levine, Pittsburgh, for designated appellants, PA Department of Community and Economic Development and the PA Economy League Central PA, LLC, as the Act 47 Coordinator for the City of Scranton.

W. Timothy Barry, Pittsburgh, for designated appellant, PA Economy League Central PA, LLC.

Stephen J. Holroyd, Philadelphia, for appellee, Fire Fighters Local Union No. 60 of the International Association of Fire Fighters, AFL-CIO.

BEFORE: McGINLEY, Judge, and SIMPSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge SIMPSON.

———————

Richard M. Goldberg, Kingston, PA, for Appellant City of Scranton.

### Table of Contents

I. Introduction .................................................................... 936
II. Background..................................................................... 937
 A. Distressed Status........................................................ 937
 B. 2002 Recovery Plan ..................................................... 937
 C. *Scranton Fire Fighters (2009)* ....................................... 938
 1. Generally ........................................................... 938
 2. Terms of 2006 Award................................................. 939
 a. Expiration of Recovery Plan .................................... 939
 b. Wages .......................................................... 939
 c. Health Care .................................................... 939
 d. Staffing and Management ........................................ 940
 e. Other Provisions of Recovery Plan Not Adopted .................. 941
 D. 2008 Award .............................................................. 942
 1. Generally ........................................................... 942
 2. Wages............................................................... 942
 3. Health Care......................................................... 944
 4. Fire Fighter Safety ................................................ 945
 5. Pension Benefits.................................................... 946
 6. Other Provisions.................................................... 947
 E. Current Appeals ......................................................... 947
 F. *Appeal Granted in Scranton Fire Fighters (2009)* ...................... 948
III. Contentions in Appeals of 2008 Award....................................... 948
IV. Discussion .................................................................... 949
 A. Violation of Plan and Controlling Law ................................... 949
 B. *IAFF Local 22*; *Ellwood City* ....................................... 949
 C. Specific Challenges to 2008 Award ...................................... 950
 1. Wages............................................................... 950
 a. Contentions .................................................... 950
 b. Analysis ....................................................... 951
 2. Health Care......................................................... 952

 a. Contentions .................................................. 952
 b. Analysis .................................................... 953
 3. Staffing and Management (*"Fire Fighter Safety"*) ..................... 954
 a. Contentions .................................................. 954
 b. Analysis .................................................... 955
 i. Sections (4)(1)-(5) of the 2008 Award ............................ 955
 ii. 2007 Staffing Levels ......................................... 956
 iii. Added Sections 4(a)-(d) of the 2008 Award ........................ 956
 iv. Managerial Rights ......................................... 957
 4. Mandatory Cost Containment Provisions ............................. 957
 a. Contentions .................................................. 957
 b. Analysis .................................................... 958
 5. Pension Benefits ............................................. 958
 a. Contentions .................................................. 958
 b. Analysis .................................................... 960
 i. Illegality ............................................... 960
 ii. Act 205–Plan Administrator ................................. 961
 iii. Act 205–Cost Estimate ..................................... 962
 6. Vacation of Entire Award ....................................... 962
 a. Contentions .................................................. 962
 b. Analysis .................................................... 963
 7. Remaining Issues ............................................. 963
 a. Constitutionality of Act 47 ................................... 963
 i. Contentions ............................................. 963
 ii. Analysis ............................................... 964
 b. Other Issues ............................................... 964
 VI. Conclusion ....................................................... 965

## I. Introduction

In these consolidated appeals originating in a 2008 interest arbitration award (2008 Award) involving the City of Scranton (City) and its fire fighters, we again examine the effect of the Municipalities Financial Recovery Act (Act 47)[1] on collective bargaining rights under the statute known as the Policemen and Firemen Collective Bargaining Act (Act 111).[2] The City, its allied intervenors,[3] and the Fire Fighters Local Union No. 60 of the International Association of Fire Fighters (Fire Fighters), appeal from an order of the Court of Common Pleas of Lackawanna County (common pleas court)[4] that denied the City's petition to vacate the award, but modified the wage, health insurance benefits and pension provisions of the award. In light of our *en banc* decisions in *City of Scranton v. Fire Fighters Local Union No. 60, of the International Association of Fire Fighters, AFL–CIO,* 964 A.2d 464 (Pa.Cmwlth.2009), *appeal granted,* —— Pa. ——, 995 A.2d 1180 (2010) *(Scranton Fire Fighters (2009))* and *City of Scranton v. E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police,* 965 A.2d 359 (Pa.Cmwlth. 2009), *appeal granted,* —— Pa. ——, 995 A.2d 1181 (2010) *(Scranton FOP (2009)),* we affirm the common pleas court's order as modified.

1. Act of July 10, 1987, P.L. 246, as *amended,* 53 P.S. §§ 11701.101–11701.501.

2. Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1–217.10.

3. The Pennsylvania Department of Community and Economic Development (DCED) and the City's Act 47 coordinator intervened before the common pleas court.

4. Senior Judge Peter J. O'Brien, formerly a commissioned judge of the Court of Common Pleas of Monroe County, presided.

## II. Background

### A. Distressed Status

■ The background in this matter has not changed significantly since our decision in *Scranton Fire Fighters (2009)*. In January, 1992, DCED determined the City to be a "financially distressed municipality" under Act 47 and appointed the Pennsylvania Economy League, LLC, as the City's Act 47 Coordinator (Coordinator), to develop a recovery plan.[5] The City is still operating under its third recovery plan, which it adopted in May 2002 (2002 Recovery Plan). The City remains a financially distressed municipality; DCED has not terminated the City's financially distressed status. See Section 253 of Act 47, 53 P.S. § 11701.253 (termination of status); *Borough of Wilkinsburg v. Dep't of Cmty. & Econ. Dev.*, 728 A.2d 389 (Pa.Cmwlth.1999) (it is within sole discretion of the Secretary of DCED to determine whether to terminate a municipality's distressed status).

### B. 2002 Recovery Plan

■ Chapter II–B of the 2002 Recovery Plan, titled "LABOR RELATIONS, COST CONTAINMENT, AND RELATED PROVISIONS," sets forth specific requirements for the City's employees. It states in part:

The following are the labor relations, cost containment, and related provisions of the [2002 Recovery Plan]. They become effective as of the date of the plan's adoption. *They cover the remainder of 2002 as well as the period 2003–2005 and beyond*; provided that the terms and provisions of any existing collective bargaining agreement shall be followed for the remainder of its current term.

*These cost containment provisions are both reasonable and necessary to the recovery of the City.* It is the intention of the City to negotiate these cost containment provisions with the bargaining unit representatives in good faith.

---

**5.** Act 47 provides a procedure by which a municipality may petition DCED for a determination of financially distressed status. Sections 202 and 203 of Act 47, 53 P.S. §§ 11701.202, 11701.203. If DCED determines a municipality is financially distressed, DCED's Secretary must appoint a coordinator to prepare a recovery plan addressing the municipality's financial problems. Section 221, 53 P.S. § 11701.221. The recovery plan must be consistent with applicable law and shall include certain factors relevant to alleviating the municipality's financial distress. Section 241, 53 P.S. § 11701.241. Among the factors a recovery plan may consider are "[p]ossible changes in collective bargaining agreements and permanent and temporary staffing level changes or changes in organization." Section 241(3), 53 P.S. § 11701.241(3). Act 47 mandates that the proposed recovery plan shall proceed through a public response period, following which the municipality may approve the recovery plan or propose an alternative one. Sections 243–46, 53 P.S. §§ 11701.243–11701.246. If the municipality approves the plan, Act 47 requires the coordinator to oversee its implementation. Section 247, 53 P.S. § 11701.247. Neither DCED's Secretary nor the municipality's chief executive officer or governing body may revise the coordinator's recovery plan. Section 244, 53 P.S. § 11701.244. However, Act 47 authorizes the coordinator to initiate amendments to the plan after the municipality adopts it. Section 249, 53 P.S. § 11701.249. Once a municipality adopts a recovery plan, it must follow the plan's recommendations or risk such penalties as the withholding or suspension of certain Commonwealth funds. Sections 251 and 264, 53 P.S. §§ 11701.251, 11701.264. Although Act 47 does not authorize a recovery plan to supersede an existing labor agreement, it proscribes any new contract from impairing implementation of the plan. Section 252, 53 P.S. § 11701.252; *Fraternal Order of Police, Fort Pitt Lodge No. 1 v. Yablonsky*, 867 A.2d 658 (Pa.Cmwlth.2005) (*en banc*).

*However, to the extent that the City is unable to reach agreement with any of its Unions, it is the express intention of the City that implementation of these cost containment provisions is mandatory. All cost containment provisions must be addressed.* The only exception to the mandatory intent and nature of these provisions will be by amendment to said provisions, based upon approval from the Coordinator, in conjunction with [DCED]. Any such change must be in conformance with the financial parameters of the Recovery Plan.

Reproduced Record (R.R.) at 480a (emphasis added). Chapter II–B contains mandatory provisions applying to all City employees, departments, bureaus and offices, R.R. at 480a–87a, provisions specifically for the fire department, R.R. at 487a–90a, provisions specifically for the police department, R.R. at 490a–95a, and provisions for other employees. Act 47 prohibits clear, specific recommendations of a recovery plan from being violated, expanded or diminished. *City of Farrell v. Fraternal Order of Police, Lodge No. 34,* 538 Pa. 75, 645 A.2d 1294 (1994).

Chapter II–C of the 2002 Recovery Plan, titled "GENERAL PLAN PROVISIONS," sets forth the Plan's general provisions for 2002–05 "and beyond." R.R. at 501a–16a. Chapter II–C provides in part (with emphasis added):

**Employee Benefits/Pensions.** *The City will continue to follow the requirements of Act 205[6] particularly as they relate to budgeting the entire cost of the Minimum Municipal Obligation.* The Recovery Plan provides for $800,000 per year to be made as a contribution to the Pension Plans to amortize the cost of the advance payment made by Provident Mutual in the year 2000 to meet the City's unfunded MMO's as of that date. The City shall review on an annual basis in conjunction with the pension actuarial reports the status of this payment and its required MMO payments. *Finally, all pension plan amendments shall be made in accordance with cost containment provisions outlined in Chapter II–B.*

R.R. at 502a (footnote added).

### C. *Scranton Fire Fighters (2009)*

#### 1. Generally

Pursuant to Act 111, the City and Fire Fighters operate under a collective bargaining agreement (CBA). Their last CBA expired on December 31, 2002. After negotiations for a 2003–2007 CBA reached an impasse, the parties selected an interest arbitration panel to establish the terms and conditions of employment for fire personnel.

On May 30, 2006, following extensive hearings and deliberations, a divided arbitration panel issued an interest award (2006 Award) covering the period from January 1, 2003 through December 31, 2007. Among other provisions, the 2006 Award directed retroactive wage increases and lump sum bonuses in excess of the 2002 Recovery Plan's mandates.

In response, the City immediately filed a petition to vacate or modify with the common pleas court. Fire Fighters answered and raised new matter.[7] Ultimately, after argument and deliberations, the common pleas court determined the 2006 Award

---

6. Act of December 18, 1984, P.L. 1005, *as amended,* 53 P.S. §§ 895.101–895.803, officially known as the Municipal Pension Plan Funding Standard and Recovery Act.

7. At about the same time, the City filed a similar petition in regard to parallel arbitration involving its police union. *See Scranton FOP (2009).* The common pleas court handled both petitions together.

violated the 2002 Recovery Plan and directed modification of the award. Fire Fighters appealed to this Court.

In *Scranton Fire Fighters (2009)*, we undertook limited review under a narrow *certiorari* standard. We rejected the argument that Act 47 is an unconstitutional limitation on Act 111 collective bargaining. See *Wilkinsburg Police Officers Ass'n by Harder v. Commonwealth*, 129 Pa.Cmwlth. 47, 564 A.2d 1015 (1989), aff'd, 535 Pa. 425, 636 A.2d 134 (1993) (*Wilkinsburg I*) (restrictions embodied in Act 47 are constitutional; even if Section 252 of Act 47 operates as a bar to prospective bargaining agreements; it would not violate the Pennsylvania Constitution); *Wilkinsburg Police Officers Ass'n by Harder v. Commonwealth*, 535 Pa. 425, 636 A.2d 134 (1993) (*Wilkinsburg II*) (plurality decision of Supreme Court affirming *Wilkinsburg I*; Act 47 did not unconstitutionally delegate municipality's fiscal authority because municipality retains its fiscal authority; Act 47 is not a prohibited special law regulating labor).

Further, we dismissed Fire Fighters' contention that the arbitration panel could compel the City to amend the 2002 Recovery Plan. Here, the City adopted the Coordinator's Recovery Plan. Because Coordinator developed the 2002 Recovery Plan, only Coordinator may initiate amendments to it. *Id.*

### 2. Terms of 2006 Award

In *Scranton Fire Fighters (2009)*, we reviewed each component of the 2006 Award to determine whether the mandatory requirements of the 2002 Recovery Plan preclude its implementation, and modified the terms of the award to comply with the Plan.

#### a. Expiration of Recovery Plan

First, we rejected Fire Fighters' argument that the 2002 Recovery Plan expired by its own terms on December 31, 2005. We noted Chapter II–B of the Plan clearly states its labor relations and cost containment provisions apply "for the remainder of 2002 as well as the period 2003–2005 *and beyond.*" *Scranton Fire Fighters (2009)*, 964 A.2d at 479 (emphasis added). As specified in the 2002 Recovery Plan, "some provisions apply in certain years, while other provisions contain no limit to their duration." *Id.*

#### b. Wages

As to wages, we determined the 2006 Award violated Section II–B(3) of the 2002 Recovery Plan (*"Personnel Costs"*)[8] because it awarded back wages or retroactive adjustments for 2003, 2004, 2005 and part of 2006. *Id.* at 480. However, we rejected the City's contention that specific wage limitations in Section II–B(2) (*"Wages"*)[9] for the years 2003–2005 remained in effect indefinitely. *Id.* Accordingly, we modified the common pleas court's orders to vacate the bonuses for 2003, 2004, and 2005, to vacate the 5.5% wage increase effective December 31, 2005, and to make the 3.5% wage increase for 2006 effective May 30, 2006, the date of the 2006 Award. *Id.* at 480–81. We confirmed the 4.0% wage increase effective January 1, 2007. *Id.* at 481.

#### c. Health Care

As to health care costs, we recognized that Section II–B(5) of the Recovery Plan

---

8. Section II–B(3) of the Plan provides in part: "Whatever the terms of future collective bargaining agreements, arbitration awards, etc., no back wages or other retroactive adjustments shall be paid." R.R. at 481 a.

9. Section II–B(2) provides in part: "For 2003, 2004, and 2005, the base hourly wages and salaries of all City employees shall not exceed existing (2002) rates...." R.R. at 481a.

("Health Insurance Benefits")[10] capped annual health care costs at $7,191,812, the City's actual 2001 cost to provide these benefits. Section II–B(5) also provided for the cessation of health care benefits to City employees who retire on or after January 1, 2003. The 2006 Award increased the existing insurance deductibles and benefits. It also extended health care benefits for a period of five years, effective January 1, 2007, to retiring bargaining unit members eligible to receive such benefits under the 1996–2002 CBA.

We rejected the City's assertion that the 2006 Award's increases in health care benefits violated the maximum health care costs clause. *Scranton Fire Fighters (2009)*, 964 A.2d at 482. We noted the City's broad assertion was not supported by the record or clarified by argument. *Id.* The City simply failed to quantify the claimed excess or explain how it could be ascertained. *Id.*

However, we rejected Fire Fighters' argument that the Recovery Plan provision addressing cessation of health care benefits for those retiring after January 1, 2003 lapsed. *Id.* We noted nothing in the plain language of Section II–B(5) limited the duration of the plan's *"Health Insurance Benefits"* provisions. Accordingly, we prospectively modified[11] the common pleas

court's orders by substituting the following language: "Effective January 23, 2009, the City will cease to extend health care benefits to employees who retire on or after that date." *Id.* at 482.

### d. Staffing and Management

In *Scranton Fire Fighters (2009)*, we also rejected Fire Fighters' contention that the *"Management Positions"* provision of the 2002 Recovery Plan specifically applying to the Fire Department, and the *"Paid Leave"* provision in Sections II–B(4) of the Plan, expired at the end of 2005. We noted the 2006 Award did not allow the City to exclude the Deputy Chief from the bargaining unit contrary to the *"Management Positions"* provision. The award also violated the *"Paid Leave"* provision by not requiring that vacation time be used in the year earned or in some circumstances, within the first three months of the following year. We therefore modified the common pleas court's orders to require that the 2006 Award comply with the recovery plan in these matters. *Id.* at 486.

We further modified the common pleas court's orders to require the 2006 Award to comply with the *"Elimination of Minimum Manning"* provision in Section II–B(7) of the 2002 Recovery Plan[12] and the

**10.** Section II–B(5) of the 2002 Recovery Plan provides (with emphasis added):

> *Health Insurance Benefits.* Beginning January 1, 2003, the maximum annual dollar amount which the City will pay to meet all health care costs of any nature shall be $7,191,812 (equal to the City's actual 2001 cost). This amount shall meet all costs relating, but not limited to, medical and major medical, dental, vision, and prescription coverages; administrative costs; and cash payments to individuals that opt not to receive City health benefits and apply to all eligible current employees and their eligible dependents and eligible former employees and their eligible dependents.

. . .

> *Effective January 1, 2003, the City will cease to extend health care benefits to employees who retire on or after that date.*
(R.R. at 482a–83a).

**11.** In *Scranton Fire Fighters (2009)*, 964 A.2d at 482 n. 15, we noted the prospective nature of this modification resulted from the concern for retroactive changes in retirement benefits for bargaining unit members who retired during the prolonged litigation.

**12.** Section II–B(7) provides (with emphasis added):

> *Elimination of Minimum Manning. Any provision of any collective bargaining agree-*

"*Organization and Scheduling*" provision specifically applying to the Fire Department, the latter of which states in pertinent part, "the City shall provide for a minimum of three firefighters on each piece of responding fire apparatus." R.R. at 488a. We noted two provisions of the 2006 Award required the assignment of more than three fire fighters to a piece of equipment in violation of the 2002 Recovery Plan. *See Scranton Fire Fighters (2009),* 964 A.2d at 486–87.

In addition, we agreed with the City that the "*Management Rights*" provision in Section II–B(1) of the 2002 Recovery Plan contains no express limitation on duration. We noted the 2006 Award did not permit the City to change job duties for each position, change schedules for each employee, and to assign work to any employee, as expressly required by Section II–B(1).[13] Accordingly, we added the operative language in the "*Management Rights*" provision to the 2006 Award.

Moreover, in *Scranton Fire Fighters (2009),* we rejected Fire Fighters' arguments that inclusion of the "*Management Rights*" language in the 2006 Award essentially eliminated collective bargaining. *See Fraternal Order of Police, Fort Pitt Lodge No. 1 v. Yablonsky,* 867 A.2d 658 (Pa.Cmwlth.2005) (*en banc*) (legislature

gave bargaining units the power to continue to be protected by Act 111, but only to the extent the bargaining does not interfere with the terms of an Act 47 recovery plan; bargaining rights bestowed by legislature may be limited or revoked by it); *Wilkinsburg I and II* (even if Section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards, it would not violate the Pennsylvania Constitution). In addition, we noted in *Scranton Fire Fighters (2009)* that Section 241(3) of Act 47 specifically authorizes recovery plan provisions involving "[p]ossible changes in collective bargaining agreements and permanent and temporary staffing level changes or changes in organization." 53 P.S. § 11701.241(3).

### e. Other Provisions of Recovery Plan Not Adopted

In *Scranton Fire Fighters (2009),* we further determined the 2006 Award violated the 2002 Recovery Plan by failing to include the following provisions of the Plan:

- Section II–B (6), titled "*Regular Part-time Employees;*"

- Section II–B (8), titled "*Clothing Allowance;*"

- Section II–B (9), titled "*Longevity;*"

---

ment between the City and any of its Unions concerning minimum manning requirements for any particular bargaining unit, shift, platoon, job classification, specialization, or position shall be eliminated. The City shall have the sole right to determine the number of personnel employed and utilized by the City. Further, the City shall have the right to layoff any employees for economic or any other reasons, without limitation. R.R. at 484a.

13. Section II–B(1) provides:
*Management Rights.* The City shall have the right to determine the organizational structure and operation of each Department including, but not limited to, the right to

determine and change job duties for each position, the right to determine and change schedules for each employee, and the right to assign work to any employee. Any provision in any collective bargaining agreement which is inconsistent with, or interferes with, the rights of the City as set forth above, shall be eliminated to the extent of such inconsistency or interference, and the City's management rights, as set forth above, shall not be the subject of any grievance procedure or arbitration clause in any collective bargaining agreement between the City and any of its unions. R.R. at 480a–81a.

- Section II–B (10), titled *"Elimination of Subcontracting Clauses;"*
- Section II–B (11), titled *"Duplication of Benefits;"*
- Section II–B (12), titled *"Sick Leave/Doctors Evaluation;"*
- Section II–B (13), titled *"Family Medical Leave Act;"*
- Section II–B (14), titled *"Short-term Disability Insurance;"*
- Section II–B (15), titled *"Workers' Compensation;"*
- Section II–B (16), titled *"Elimination of Past Practices;"*
- Section II–B (17), titled *"Grievance Procedures;"*
- Section II–B (18), titled *"Drug and Alcohol Testing;"*
- Section II–B (19), titled *"Modified Duty;"*
- Section II–B (20), titled *"Absence Report;"* and
- Section II–B (21), titled *"Job Descriptions."*

*Id.* at 487.

We noted the 2002 Recovery Plan specifically states "to the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that the implementation of these cost containment provisions is mandatory." R.R. at 480a. Therefore, we modified the common pleas court orders to expressly include those provisions into the Award. *See Scranton Fire Fighters (2009)*, 964 A.2d at 488.

### D. 2008 Award

#### 1. Generally

In 2007, the City and Fire Fighters reached an impasse in their negotiations regarding the terms and conditions of a new CBA to become effective January 1, 2008. As a result, the parties requested interest arbitration proceedings under Act 111. Fire Fighters selected Thomas W. Jennings, Esquire, as their designated arbitrator. The City selected Kenneth M. Jarin, Esquire, as its designated arbitrator. Arbitrators Jennings and Jarin designated Ralph H. Colflesh, Jr., Esquire, to serve as the panel's impartial chairman.

The arbitration panel held evidentiary hearings in February and April 2008. It closed the record in May 2008.

In November, 2008, prior to this Court's decisions in *Scranton Fire Fighters (2009)* and *Scranton FOP (2009)*, the divided arbitration panel issued its 2008 Award for a seven-year term, starting on January 1, 2008, and continuing through December 31, 2014. The panel majority, noting the pending appeals of the 2006 Award, recognized that Section 252 of Act 47 may apply to interest arbitration awards, but nevertheless found that the 2008 Award did not violate, expand or diminish the provisions of the 2002 Recovery Plan.

However, the panel majority's decision erroneously states that even if the City believes that the terms of the 2008 Award violate the 2002 Recovery Plan, Act 111 mandates that the City work with Coordinator to amend the Plan to conform to the Award. We rejected this precise argument in *Scranton Fire Fighters (2009)*. *See also Int'l Ass'n of Firefighters Local 1400, Chester City Firefighters v. City of Chester*, 991 A.2d 1001 (Pa.Cmwlth.2010) (*Chester FireFighters (2010)*) (same). The 2008 Award included the following terms.

#### 2. Wages

In its 2008 Award, the arbitration panel majority noted that prior to the City being declared "financially distressed" in 1992, Fire Fighters received wages that were 7% above the average of comparable third class cities and surrounding communities.

2008 Award, Maj. Op., at 6. By 2008, Fire Fighters earned 78% of the average salary earned by other fire fighters in comparable departments. *Id.* Noting this and other factors, including the City's improving financial condition, the panel majority determined the time was appropriate to return Fire Fighters to the historical parity they traditionally enjoyed. *Id.* at 7. Accordingly, the 2008 Award then provided for the following wage increases:

- January 1, 2008—8.0% increase across the board;
- January 1, 2009—3.0% increase across the board;
- July 1, 2009—3.0% increase across the board;
- January 1, 2010—3.0% increase across the board;
- July 1, 2010—3.0% increase across the board;
- January 1, 2011—3.0% increase across the board;
- July 1, 2011—3.0% increase across the board;
- January 1, 2012—3.0% increase across the board;
- July 1, 2012—3.0% increase across the board;
- January 1, 2013—3.2% increase across the board;
- July 1, 2013—3.2% increase across the board;
- January 1, 2014—3.2% increase across the board;
- July 7, 2014—3.2% increase across the board.

*See* 2008 Award, Maj. Op., at 7–8. The panel majority found that, in the absence of any express recommendations in the 2002 Recovery Plan for the above years, the above increases do not violate, expand or diminish the Plan, and take into account the City's ability to pay as evidenced by the record. 2008 Award, Maj. Op., at 8.

The panel majority further stated that if any of the wage increases in the 2006 Award were confirmed:

the net effect will be that the members of this bargaining unit will *not* have had to endure a six-year wage freeze. Should this happen, the Panel wishes to avoid a "windfall" as a result. Accordingly, should any of the wage increases of the 2003–2007 Award ultimately be reinstated and confirmed the wage increases stated above for this bargaining unit will be reduced on a percentage or, part of a percentage basis, accordingly and the reduction shall be spread evenly over the entire term of this Award.

2008 Award, Maj. Op., at 8–9.

In response, the City filed a petition to vacate the 2008 Award. The City averred the Award diminishes the provisions of 2002 Recovery Plan and directs the City to violate its obligations under Act 47. In particular, the City averred the Award's wage increases violate the 2002 Recovery Plan inasmuch as they are retroactive and exceeded the Plan's salary mandates.

The common pleas court denied the City's petition to vacate. However, the court, in light of the 2002 Recovery Plan and our decision in *Scranton Fire Fighters (2009)*, modified the 2008 Award.

Regarding the Award's wage increases, the common pleas court recognized the wage limitations in the 2002 Recovery Plan applied only in the years 2003, 2004 and 2005. *Scranton Fire Fighters (2009)*. However, the common pleas court determined "the attempt by the arbitration panel to retroactively adjust wages by semi-annual increases does violate the recovery plan." Comm. Pleas Ct. Slip Op., 11/18/09, at 6. Accordingly, the court modified the Award by deleting the mid-year increases in the years 2009–2014.

### 3. Health Care

Section 3 of the 2008 Award included the following health care provisions:

*Health Insurance.*

. . . .

A. The City is ordered to fully cooperate with the Health Care Committee by providing all information reasonably necessary to its function and by cooperating with the National Health Care Consultant in the Committee's efforts to contain health care costs.

B. Effective 30 days after the issuance of this Award, the applicable deductibles and/or copayments shall be adjusted as follows:

1. The maximum individual annual deductible under the medical insurance plan shall be increased from $200 to $400 for in-network and out-of-network.

2. The maximum family annual deductible shall be increased from $400 to $800 for in-net work and out-of-network.

3. The per-visit emergency room co-pay shall be increased from $35 to $75.

4. The per-visit doctor co-pay shall be increased from $5 to $10.

5. The co-payment for the prescription plan shall be increased to $6 for generics and $15 for brand name drugs.

C. Article XV, Sections 3(A) and (B) of the collective bargaining agreement shall be amended as follows:

1. Effective January 1, 2008, the City shall be liable for the cost of health insurance (over and above the listed deductibles and co-payments) up to the annual amounts listed below:

| | 1/1/08 | 1/1/11 | 1/1/12 | 1/1/13 |
|---|---|---|---|---|
| Single [Cov.] | $ 4,430 | $ 5,316 | $ 6,380 | $ 7,656 |
| Parent/Child | $ 8,758 | $10,509 | $12,611 | $15,133 |
| Parent/Children | $ 9,443 | $11,331 | $13,598 | $16,317 |
| Husband/Wife | $11,113 | $13,336 | $16,003 | $19,204 |
| Family | $11,920 | $14,304 | $17,164 | $20,597 |

2. As of January 1, 2008, the City shall be responsible for 50% of any increases in the cost of health care for active bargaining unit employees beyond that provided above and the active employees shall be responsible for the balance of any subsequent increases as determined by the healthcare provider.

D. Retiree Health Insurance shall be amended as follows: *Effective January 1, 2008, all bargaining unit members who thereafter retire and are eligible to receive retiree health insurance under the 1996–2002 Agreement shall continue to be eligible to receive insurance for a period of 10 years following the bargaining unit member's retirement.*

. . . .

2008 Award, Maj. Op., at 9–11 (emphasis added).

In its petition to vacate, the City averred the adjustments in the applicable deductibles and copayments for individuals and families in Sections 3(B) and (C) of the 2008 Award ignore the 2002 Recovery Plan's express limitation on health care costs. The City further alleged that Section 3(D) of the Award, which allows certain personnel to retire with health care benefits for 10 years after retirement, also violates the Plan.

The common pleas court rejected the City's argument that the health care provisions in Paragraphs 3(B) and (C) of the Award violate the maximum annual cap in Section II–B(5) of the 2002 Recovery Plan. The court found the record did not support the City's broad assertion.

Noting our decisions in *Scranton Fire Fighters (2009)* and *Scranton FOP (2009)*, however, the court determined the retire-

ment health insurance benefits provision in Paragraph 3(D) violates the Plan. The court thus modified Paragraph 3(D) as follows: "Effective February 6, 2009 [the date of this Court's Order in *Scranton FOP (2009)* ], the City will cease to extend health care benefits to employees who retire on or after that date." Comm. Pleas Ct. Order, 11/18/2009.

### 4. Fire Fighter Safety

The 2008 Award included *"Fire Fighter Safety* " provisions similar to those included in the 2006 Award.[14] In its petition to

14. Section 4 of the 2008 Award provides:

The Panel recognizes that the 150 fire fighter "floor" contained in the 1996–2002 collective bargaining agreement cannot be continued without the agreement of the City. As the City made it clear that it would not so concur, the Panel acknowledges that the "floor" must be removed from the contract.

A majority of the Panel is convinced from the evidence of record that there is a direct and irrefutable connection between the lives and safety of the fire fighters and the number of personnel actually assigned to fire apparatus that the City determines to operate. In that regard, it would appear that the NFPA 1710 standards developed by a nationally-renowned body of experts to which the City belongs provides the scientifically-sound and persuasive guidance on this vital issue; indeed, the City appeared to acknowledge as much, as it made no attempt to rebut the Union's evidence on fire safety, and NFPA 1710 in particular.

In this regard, the Plan provides no binding recommendations to the Panel. The [Revised Recovery Plan] does state that any provision in the collective bargaining agreement "concerning minimum manning requirements for any particular bargaining unit, shift, platoon, job classification, specialization, or position shall be eliminated." [H]owever, the Plan does not state that there is any limitation on *per apparatus* staffing as, indeed, it could not, as such issues are mandatory subjects of bargaining as per *[City of Erie v. Int'l Ass'n of Firefighters Local 293*, 836 A.2d 1047 (Pa.Cmwlth. 2003) ].

Accordingly, the Panel directs the following as being the minimal necessary staffing to protect the safety and lives of the bargaining unit:

Effective immediately, the portion of Article XIX, Section 3 of the collective bargaining agreement that provides "Except as otherwise provided in this Agreement, the bargaining unit complement shall at all times be maintained at not less than One Hundred Fifty (150) bargaining unit members" and Article XIX, Section 4 and 5 regarding layoff shall be deleted and shall be replaced with the following language:

1. Each engine company maintained by the City shall be actually staffed on each shift with no less than three (3) personnel.
2. Each truck company maintained by the City shall be actually staffed on each shift with no less than three (3) personnel.
3. The Rescue Unit shall actually be staffed on each shift with no less than three (3) personnel.
4. If the City determines to utilize an apparatus as a Quint (a combination ladder and engine apparatus) and merges into a single engine company and single truck company into one Quint company, it shall actually be staffed with no less than five (5) personnel.
5. The number of pieces of apparatus and fire companies maintained by the City is left to its discretion. However, if the City temporarily or permanently closes more than three companies at the same time, the minimum manpower per apparatus provided above shall be increased for engines, trucks and Rescue from three to four personnel. Although nothing in this provision shall nullify the City's obligation to pay overtime, this provision is neither intended to create overtime or any other additional costs to the City. Rather, the sole purpose of this provision is to ensure that there is a safe level of manning at fires if the City temporarily or permanently closes more than three fire companies, and the provision is not intended to create a minimum number of fire fighters in the bargaining unit or require the City to hire additional fire fighters. Should the parties not agree on whether the City has closed a company, the panel named above shall make a determination whether it has been closed or not.

vacate, the City alleged that the 2002 Recovery Plan provides that any CBA provision between the City and any of its unions concerning minimum manning requirements is eliminated. *See* Section II–B(7) (*"Elimination of Minimum Manning."*) The Plan also provides that the City has the right to determine the organizational structure and operation of each of its departments and that any inconsistent provision in a CBA is eliminated. *See* Section II–B(1) (*"Management Rights."*)

The City further contended the 2008 Award institutes staffing requirements that are inconsistent with the Plan's elimination of minimum manning requirements and the City management rights prerogatives. The City also alleged the 2008 Award's provisions regarding "unnecessarily" endangering the health and safety of bargaining unit members are vague, impracticable and without basis, and serve only as a means to interfere with the City's management rights prerogatives.

The common pleas court, however, determined the 2008 Award's fire safety pro-

vision does not in any way violate the 2002 Recovery Plan or, surprisingly, this Court's decision in *Scranton Fire Fighters (2009)*, which deleted some of the same provisions from the 2006 Award.

### 5. Pension Benefits

The 2008 Award also amended Fire Fighters' pension plan. Section 7 of the Award (*"Pension Benefits "*) provides:

> The Panel finds that the Revised Recovery Plan is silent on the issue of pension benefits and, as a result, there are no recommendations in the Plan on this issue which are binding on the Panel.
>
> <u>Based upon the actuarial testimony presented during the hearing, a majority of the Panel is convinced that the following provisions may be awarded without detrimentally effecting [sic] the actuarial soundness of the City's pension plans as a whole.</u>
>
> Accordingly, the Pension Plan shall be amended to provide for a normal pen-

> Notwithstanding anything to the contrary, nothing herein shall require the City to staff any piece of apparatus with more, nor shall anything herein authorize the City the [sic] staff each apparatus with less, [sic] manpower than that level of manpower that staffed each piece of apparatus as of December 31, 2007.
>
> In addition, the following language shall also be added to the collective bargaining agreement:
>
> a. No member of the bargaining unit shall be required to perform any duty that *unnecessarily* endangers the health or safety of that member beyond those dangers and risks unavoidably inherent in their position.
>
> b. Under no circumstance shall the City *unnecessarily* endanger the health or safety of a bargaining unit member by requiring the bargaining unit member to be subjected to a *managerial* or physical condition that could have been anticipated and/or prevented by the City by the

> expenditure of moneys or other City action.
>
> c. The City shall abide by all federal, state and local laws and regulations governing all aspects of the workplace and working conditions that would otherwise apply to a private sector employer. The terms and conditions of such laws are incorporated into the collective bargaining agreement as if fully set forth therein.
>
> d. No fire fighter shall be required to utilize a City vehicle that would not pass a State inspection.
>
> Again, a majority of the Panel finds that these provisions do not expand, violate or diminish the Revised Recovery Plan. Furthermore, a majority of the Panel finds that these provisions are in harmony with the managements [sic] rights provision contained in the Plan even assuming, *arguendo*, that said clause provided any binding recommendation beyond 2005.
>
> 2008 Award, 11/19/08, at 11–15 (italics in original).

sion to be paid in the following amount of average annual salary:

| Years of Service | Pct. of Average Year Salary |
|---|---|
| 20 years | 60 percent |
| 21 years | 62 percent |
| 22 years | 64 percent |
| 23 years | 66 percent |
| 24 years | 68 percent |
| 25 years | 70 percent |

The calculation of average year salary shall include the longevity, overtime and other pay incentives. In this connection, a majority of the Panel notes that the City currently bases its contributions to the Pension Plan on total compensation and agrees with the testimony of the Union's actuary that this change has little actuarial impact on the plan, and so finds as a matter of fact.

2008 Award, Maj. Op., at 16 (bolding in original, underline added).

In its petition to vacate, the City averred the pension benefits award is without support and fails to comply with the requirements of Act 205 and the applicable pension law. The City further averred the Award's pension benefits violate the limitations on pension benefits and the duplication of benefits under the controlling legislation and the 2002 Recovery Plan.

The common pleas court noted the City's arguments. It focused, however, on Section 1(b) of the Act of August 17, 1951, P.L. 1254, *as amended,* 53 P.S. § 30495(b) (1951 Municipal Pension Act; an act fixing the minimum pensions of police officers and fire fighters in certain cities), which provides (with footnote and emphasis added):

A city of the second class A[15] may grant a cost of living increase to persons receiving an allowance from either the police or firemen's pension system, by reason of, and after termination of the services of any member of the retirement systems. *The total allowance from the systems shall not exceed one-half of the salary currently paid to a patrolman or fireman of the highest pay grade.*

Based on this provision, the common pleas court modified the 2008 Award to reflect a maximum retirement benefit of 50% of the salary paid to a fire fighter of the highest grade.

### 6. Other Provisions

The 2008 Award also provided for an increase in life insurance benefits to twice the yearly wage of the bargaining unit member and provided for rank differential of four percent in base wages paid to ranks above Private. The Award also directed the parties to conduct a study of a possible expansion of the Fire Department to include a QRS (quick response system) program, ambulance duties and a rapid intervention team. The City did not address these provisions in its petition to vacate, and the common pleas court did not review them in its November, 2009, opinion and order.

### E. Current Appeals

■ The City, joined by intervenors DCED and Coordinator (collectively, the City), and Fire Fighters appeal from the common pleas court's order modifying the 2008 Award. Appellate review of an Act 111 arbitration award is in the nature of narrow *certiorari. City of Phila. v. Int'l Ass'n of Firefighters, Local 22,* — Pa. ——, 999 A.2d 555 (2010) *(IAFF Local 22); Scranton Fire Fighters (2009).* It is limited to issues regarding: (1) the jurisdiction of the arbitrator; (2) the regularity of the proceedings; (3) whether the arbitrator exceeded his powers; and, (4) deprivation of constitutional rights. *Id.*

---

**15.** Scranton is the Commonwealth's only city of the second class A.

### F. Appeal Granted in *Scranton Fire Fighters (2009)*

In June, 2010, after the City and Fire Fighters filed their cross-appeals from the common pleas court's order modifying the 2008 Award, the Supreme Court granted Fire Fighters' petition for allowance of appeal from our order in *Scranton Fire Fighters (2009)* that modified the 2006 Award. *See City of Scranton v. Fire Fighters Local Union No. 60, of the Int'l Ass'n of Fire Fighters, AFL–CIO,* —— Pa. ——, 995 A.2d 1180 (2010). The Supreme Court granted Fire Fighters' petition with respect to the following issues:

(1) Whether Section 252 of Act 47 applies to Act 111 interest arbitration awards?

(2) If Section 252 applies to Act 111 interest arbitration awards, whether a recovery plan promulgated under Section 252 must be "consistent with applicable law" that recognizes binding arbitration and the right to bargain pursuant to Act 111?

(3) Whether the Commonwealth Court erred in requiring compliance with the recovery plan requiring cessation of healthcare benefits to employees retiring after January 1, 2003?

(4) Whether the Commonwealth Court erred in failing to remand the matter to the Act 111 board of arbitration instead of modifying the interest arbitration award itself?

(5) Whether the Commonwealth Court erred in determining that the City remains distressed under Act 47 and that the recovery plan remains in effect?

*Id.* at 1181.

### III. Contentions in Appeals of 2008 Award

On appeal in the present case, the City raises three general issues. The City contends the 2008 Award violates our decision in *Scranton Fire Fighters (2009)*, the controlling statutes, and the 2002 Recovery Plan. The City further contends the 2008 Award must be vacated in its entirety so that the mandates in *Scranton Fire Fighters (2009)* can be considered and incorporated, and that the trial court erred in attempting to make only limited modifications to the 2008 Award that did not fully address the controlling mandates of *Scranton Fire Fighters (2009)*.

Fire Fighters also raise several issues. First, Fire Fighters contend the common pleas court erred in vacating the mid-year wage increases. Second, Fire Fighters contend the common pleas court erred in determining that the pension benefit improvements in the 2008 Award were unlawful because the City failed to raise the legality of pension benefits award before either the arbitration panel or common pleas court. Third, Fire Fighters contend Act 47 is either unconstitutional on its face or as applied by the common pleas court.

Additionally, Fire Fighters raise several contentions previously considered and rejected in *Scranton Fire Fighters (2009)* and *Scranton FOP (2009)*. Fire Fighters contend: the common pleas court erred in concluding that Section 252 of Act 47 applies to interest arbitration awards, as opposed to "agreements" or "settlements," as stated in the statute; a recovery plan must conform with applicable law regarding mandatory subjects of Act 111 collective bargaining; the common pleas court erred when it eliminated retiree health benefits for employees who were already vested with those benefits; the City can voluntarily amend the 2002 Recovery Plan to bring the 2008 Award in compliance with the Plan, or alternatively, an Act 111 interest arbitration award is a mandate to the City compelling legislative action such as amendment of the Plan; the City's unclean hands in its failure to comply with many

sections of the 2002 Recovery Plan precludes it from seeking enforcement of the Plan in this proceeding; and, if the Court concludes the 2008 Award is in violation of the 2002 Recovery Plan, the matter should be remanded to the arbitration panel.

## IV. Discussion

### A. Violation of Plan and Controlling Law

The City first contends the 2008 Award, even as modified by the common pleas court, violates the 2002 Recovery Plan, Act 47 and our decision in *Scranton Fire Fighters (2009)*. First, Section 252 of Act 47, 53 P.S. § 11701.252 (Plan not affected by certain collective bargaining agreements or settlements) provides:

> A [CBA] or arbitration settlement executed after adoption of a plan shall not in any manner violate, expand or diminish its provisions.

■■■ Section 252 is a limitation on collective bargaining that does not violate the constitution. *Wilkinsburg II; Chester Firefighters (2010); Scranton Fire Fighters (2009); Wilkinsburg I.* An Act 111 arbitration award cannot require an Act 47 municipality to disregard its recovery plan. *City of Farrell; Chester Firefighters (2010); Scranton FOP (2009); Scranton Fire Fighters (2009).* Where an Act 47 coordinator's recovery plan is adopted, the municipality is not empowered to initiate an amendment to it. *Chester Firefighters (2010); Scranton FOP (2009); Scranton Fire Fighters (2009).*

Here, the City asserts, this Court's modifications of the 2006 Award in *Scranton Fire Fighters (2009)*, which eliminated certain provisions of the Award, and incorporated other provisions to ensure that the 2006 Award did not violate the 2002 Recovery Plan, are controlling. The City thus contends the 2008 Award directly contradicts and defies *Scranton Fire Fighters (2009)*.

### B. *IAFF Local 22; Ellwood City*

In addition to *Scranton Fire Fighters (2009)* and the law cited therein, this Court finds our Supreme Court's recent decisions in *IAFF Local 22* and *Borough of Ellwood City v. Pennsylvania Labor Relations Board,* —— Pa. ——, 998 A.2d 589 (2010), instructive regarding the review of disputed provisions in an Act 111 interest arbitration award. In particular, in *IAFF Local 22* the Supreme Court stated (with emphasis added):

> Given the General Assembly's intent in passing Act 111, we conclude that, when reviewing a disputed provision in an Act 111 interest arbitration award, a court should first inquire whether the provision concerns a topic that is subject to the right of collective bargaining, *i.e.*, is rationally related to the terms and conditions of employment. *If the topic is so subject, the court should next inquire whether the award also implicates the non-bargainable managerial prerogatives of a public employer. If the award does, the court must then determine whether the award unduly infringes upon the exercise of those managerial responsibilities. If ... the award unduly infringes upon the exercise of managerial responsibilities, then the award concerns a managerial prerogative that lies beyond the scope of collective bargaining, [the award] reflects an excess of the [arbitration] board's Act 111 powers, and is voidable.*

*Id.* at ——, 999 A.2d at 570–71.

In *Ellwood City*, the Supreme Court recognized that managerial prerogatives falling outside the realm of Act 111 collective bargaining "include, but are not limited to, '*such areas of discretion or policy as the functions and programs of the public*

*employer, standards of services, its overall budget, utilization of technology, the organizational structure, and selection and direction of personnel.'* *Id.* at, 998 A.2d at 599 (emphasis added, citation omitted).

## C. Specific Challenges to 2008 Award

In accord with the statutory and case law discussed above, we review the City's specific challenges to the 2008 Award.

### 1. Wages

#### a. Contentions

First, the City contends the Wages provision of the 2008 Award, which provides for bi-annual wage increases totaling 45% over seven years, constituted a blatant effort to disregard the prohibition in Section II–B(3) of the Plan (*"Personnel Costs "*), which prohibits back wage awards or retroactive adjustments. In support of its position, the City cites the following language in the 2008 Award:

> While the Panel is aware that the City still remains distressed, it also finds that the City has made considerable economic progress over the past few years, and has finished in the black for several years in a row, enjoying considerable unreserved fund balances during that period. The Panel also notes that, while the members of the bargaining unit have found their wages frozen, the City has given significant wage increases to a number of managerial employees, with new, highly-paid positions also being created during this recovery "cycle." Indeed, the Fire Chief has received considerable wage increases since 2002.
>
> *Based on the above, a majority of the Panel is convinced that the time is appropriate to return to members of this bargaining unit to [sic] the historical parity they traditionally enjoyed, both pre-recovery and even during the recovery period prior to 2003.* Accordingly,

the Panel orders the wage increases set forth as follows. . . .

2008 Award, Maj. Op., at 7 (emphasis added).

The City further contends that in light of this Court's ultimate ruling in *Scranton Fire Fighters (2009)* that allowed wage increases of 3.5% in May, 2006, and 4% in January, 2007, the large wage increases bestowed by the arbitration panel in the 2008 Award eviscerated any possible fiscal recovery intended by the 2002 Recovery Plan and constituted a return to the pre-recovery plan excesses, in violation of Act 47's "spirit of recovery."

In addition, the City contends the common pleas court's limited modification of the 2008 Award by deleting the mid-year wage increases, without any effort to assess the impact of the 2006 and 2007 increases in base wages this Court permitted in *Scranton Fire Fighters (2009)*, does not cure the 2008 Award's violation of the 2002 Recovery Plan.

In response, Fire Fighters contend that in the absence of any specific recommendations in the 2002 Recovery Plan beyond the year 2005, the wage increases in the 2008 Award must be affirmed. *City of Farrell; Scranton Fire Fighters (2009).* Even accepting the City's argument that the allegedly "excessive" increases are in fact an attempt to compensate workers for the many years they suffered without an increase, the simple fact is that these increases are "prospective;" nothing in the 2002 Recovery Plan expressly prevents them, and that under narrow *certiorari* review this Court may not disturb the provisions of the 2008 Award merely because it does not agree with them. *Scranton Fire Fighters (2009).*

Fire Fighters further counter there is nothing out of the ordinary in an arbitration panel's award of wage increases bro-

ken into steps during the course of a calendar year. By breaking the increase into parts, the City actually benefits in that an increase broken into parts results in a smaller increase for the year. For example, a 6% increase broken into two 3% semi-annual increases results in a 4.5% increase for the year.

### b. Analysis

■ In *Scranton Fire Fighters (2009)*, we determined that wage increases made for years prior to the year of the 2006 Award were retroactive wage adjustments prohibited by Section II–B(3) of the Plan ("*Personnel Costs*"). *See id.* at 480. As for wage adjustments for the year of the 2006 Award, we modified the effective date to be the same as the date of the Award (May 30, 2006). *Id.* The Supreme Court did not accept these determinations for appeal. *See Scranton Fire Fighters*, —— Pa. ——, 995 A.2d at 1180–81. Following the same approach here as we did in *Scranton Fire Fighters (2009)*, we hold the 8% wage increase for January 1, 2008, should be modified to start as of the date of the 2008 Award (November 19, 2008).

■ However, we reject the City's contentions that the remaining wage increases in the 2008 Award constitute "back wages or retroactive adjustments" in violation of Section II–B(3) of the Plan. Unlike the lump sum bonuses and wage increases for years that pre-dated the effective date of the 2006 Award in *Scranton Fire Fighters (2009)*, the wage increases in the 2008 Award for the years 2009 through 2014 are clearly *prospective* in operation, regardless of whether they are intended to make up for purported lost ground. Consequently, they do not violate Section II–B(3) of the Plan or this Court's decision in *Scranton Fire Fighters (2009)*.

Here, the specific limitations on wage increases in the 2002 Recovery Plan apply only in the years 2003, 2004 and 2005. *Scranton Fire Fighters (2009)*. Had the 2002 Recovery Plan intended to impose limitations on wage increases beyond the year 2005, it needed to so specify. It did not. Therefore, we cannot conclude that the 2008 Award's wage increases for the years 2009 through 2014 violate either the 2002 Recovery Plan or controlling law. *City of Farrell; Scranton Fire Fighters (2009)*.

For the same reasons, we further hold the respected common pleas court erred in deleting the mid-year wage increases for the years 2009 through 2014. In deleting the mid-year wage increases, the common pleas court reasoned:

> Since the [2002 Recovery Plan] plan specifically provides that the base hourly wage and salary of all City employees for 2003, 2004, and 2005 shall not exceed existing 2002 rates[,] the attempt by the arbitration panel to retroactively adjust wages by semi-annual increases does violate the recovery plan. On the other hand, the [2002 Recovery Plan] does not preclude the prospective salary increases of a reasonable amount.

Comm. Pleas Ct. Slip. Op., 11/18/2009, at 6. Thus, the common pleas court determined the 2008 Award's semi-annual wage increases for the years 2009 through 2014 to be in part retroactive to at least 2003.

As discussed above, however, we reject the City's contention that the 2009 through 2014 wage increases violated the 2002 Recovery Plan's prohibition against retroactive adjustments, regardless of the motive behind the award. Rather, they are clearly prospective in nature and are not prohibited by any wage limitations in the 2002 Recovery Plan. *Scranton Fire Fighters (2009)*. We therefore modify the common pleas court's order to reinstate the mid-year wage increases for the years 2009 through 2014.

Nevertheless, we are mindful that in *Scranton Fire Fighters (2009)*, we confirmed the 2006 Award's 3.5% wage increase for 2006 (effective the date of the Award) and the 4% wage increase for 2007. We are also mindful that our Supreme Court will revisit the broader issue of whether Section 252 of Act 47 properly applies to Act 111 arbitration awards. Accordingly, we direct the parties' attention to the language in the *"Wages"* provision of the 2008 Award indicating that:

> should any of the wage increases of the [2006] Award be ultimately confirmed, the net effect will be that the members of this bargaining unit will *not* have had to endure a six-year wage freeze. Should this happen, the Panel wished to avoid a "windfall" as a result. *Accordingly, should any of the wage increases of the [2006] Award ultimately be reinstated and confirmed the wage increases stated above for this bargaining unit will be reduced on a percentage or, part of a percentage basis, accordingly and the reduction shall be spread evenly over the entire term of this Award.*

2008 Award, Maj. Op., at 7–8 (emphasis added). In accord with the above language of the 2008 Award, the parties are charged with the responsibility of determining the proper adjustment of the wage increases in the 2008 Award "to avoid a windfall" for Fire Fighters should any of the wage increases in the 2006 Award "ultimately be reinstated or confirmed." *Id.*

### 2. Health Care

#### a. Contentions

The 2008 Award included a health care provision very similar to the one in the 2006 Award at issue in *Scranton Fire Fighters (2009)*. In that case we noted Section II–B(5) of the Plan (*"Health Insurance Benefits"*) caps annual health care costs at $7,191,812 (the City's actual cost to provide these benefits in 2001), but we questioned whether any evidence demonstrated that the 2006 Award's increases in benefits would result in costs in excess of that cap. Therefore, in *Scranton Fire Fighters (2009)* we allowed the increased benefits in the 2006 Award.

The City asserts that in the 2008 Award the arbitration panel majority did not consider the Plan's cap on health care costs or the effect of the increases allowed in the 2006 Award and ultimately confirmed in *Scranton Fire Fighters (2009)*. The City argues the 2002 Recovery Plan does more than simply place caps on annual health care costs; it requires the assessment of the costs of the increased benefits as compared to the fiscally distressed City's ability to pay. The City urges the omission of that crucial analysis violates the 2002 Recovery Plan; thus, the 2008 Award must be vacated in its entirety.

The City also contends the common pleas court properly rejected the extension of health care benefits to retirees in recognition of this Court's clear ruling in *Scranton Fire Fighters (2009)*.

In response, Fire Fighters contend that the City fails to offer a single specific fact that the health care benefit increases contained in the 2008 Award exceed the caps imposed by the 2002 Recovery Plan. Nothing in the 2002 Recovery Plan freezes the City's health care obligations regarding union employees. Rather, the 2002 Recovery Plan merely provides a cap on the overall amount. *See* Section II–B(5) (*"Health Insurance Benefits"*). R.R. at 482a–83a. Fire Fighters further argue the 2008 Award increased employee deductibles and co-pays, and given the slight changes in the City's obligation, one is hard pressed to determine just how the 2008 Award violates the 2002 Recovery Plan. Fire Fighters also argue nothing in

the 2002 Recovery Plan requires an investigation as to whether the City can pay the increased benefits; and the City points to no provision in Act 47 that requires such an analysis.

However, Fire Fighters acknowledge the trial court's deletion of health insurance benefits for retirees effective February 6, 2009, is consistent with this Court's decisions in *Scranton Fire Fighters (2009)* and *Scranton FOP (2009)*. Nonetheless, Fire Fighters stress that the Supreme Court is now reviewing the issue.

### b. Analysis

■ Our analysis in *Scranton Fire Fighters (2009)* and *Scranton FOP (2009)* is controlling. The City's contention that the health insurance increases in the 2008 Award exceed the cap is not adequately supported by the record. The City cites brief testimony from Harold Miller (Coordinator's Analyst), a certified public accountant and research analyst employed by Coordinator. Coordinator's Analyst testified before the arbitration panel:

> The healthcare was held constant at seven point one million and change. Healthcare costs of the City in 2000, and I don't have the number in '06, but in 2007 was almost $12 million.

R.R. at 280a.

Other than Coordinator's Analyst's brief oral statement that the City's 2007 healthcare costs were "almost $12 million," the City again failed to adequately quantify or in any way document its annual healthcare costs, or explain how the claimed excess in healthcare costs occasioned by the 2008 Award may be ascertained.

Section II–B(5) of the Plan ("*Health Insurance Benefits*") specifies that the $7,191,812 cap:

> shall meet all costs relating, but not limited to, medical and major medical, dental, vision, and prescription coverag-

es; administrative costs; and cash payments to individuals that opt not to receive City health benefits and apply to all eligible current employees and their eligible dependents and eligible former employees and their eligible defendants. *The allocation of this amount to cover eligible recipients shall be fair and equitable and shall generally be in proportion to the actual 2001 costs incurred for each department/bargaining unit.*

R.R. at 482a (emphasis added). However, Section II–B(5) of the Plan does not require that an arbitration panel perform an independent cost evaluation.

The City had the opportunity to present evidence as to proportionality, but it did not do so. Also, the City had an opportunity to quantify cost increases attributable to Fire Fighters' healthcare issue positions before the arbitrators, but it did not do so. Absent sufficient evidence of record, we reject the City's contention that the healthcare benefit increases in the 2008 Award violate the cap in Section II–B(5) of the Plan. *Scranton Fire Fighters (2009); Scranton FOP (2009).*

We further note Fire Fighters acknowledge that the common pleas court's deletion of health care benefits for retirees effective February 6, 2009, the date of this Court's decision in *Scranton FOP (2009)*, is consistent with our decisions in *Scranton FOP (2009)* and *Scranton Fire Fighters (2009)*. However, to be entirely consistent with *Scranton Fire Fighters (2009)*, we modify the trial court's order as follows: "Effective *January 23, 2009* [the date of this Court's decision in *Scranton Fire Fighters (2009)*, which was issued before the decision in *Scranton FOP (2009)* ], the City will cease to extend health care benefits to employees who retire on or after that date."

### 3. Staffing and Management ("*Fire Fighter Safety*")

#### a. Contentions

The City next contends the "*Fire Fighter Safety*" provisions in Section 4 of the 2008 Award, which, to a large extent, are identical to the "*Fire Fighter Safety*" provisions of the 2006 Award, violate the 2002 Recovery Plan in the same manner as this Court determined in *Scranton Fire Fighters (2009)*. The City asserts the 2008 Award, like the 2006 Award, again dictates the number of personnel to staff certain pieces of apparatus in violation of Section II–B(1) ("*Management Rights*") and Section II–B(7) of the Plan ("*Elimination of Minimum Manning*"). The common pleas court, however, completely disregarded *Scranton Fire Fighters (2009)* and allowed the Fire Fighter Safety provisions in the 2008 Award to stand.

The 2008 Award also provides:

Notwithstanding anything to the contrary, nothing herein shall require the City to staff any piece of apparatus with more, nor shall anything herein authorize the City the [sic] staff each apparatus with less, [sic] manpower than that level of manpower that staffed each piece of apparatus as of December 31, 2007.

In addition, the following language shall also be added to the collective bargaining agreement:

a. No member of the bargaining unit shall be required to perform any duty that *unnecessarily* endangers the health or safety of that member beyond those dangers and risks unavoidably inherent in their position.

b. Under no circumstance shall the City *unnecessarily* endanger the health or safety of a bargaining unit member by requiring the bargaining unit member to be subjected to a managerial or physical condition that could have been anticipated and/or prevented by the City by the expenditure of moneys or other City action.

c. The City shall abide by all federal, state and local laws and regulations governing all aspects of the workplace and working conditions that would otherwise apply to a private sector employer. The terms and conditions of such laws are incorporated into the collective bargaining agreement as if fully set forth therein.

d. No fire fighter shall be required to utilize a City vehicle that would not pass a State inspection.

2008 Award, Maj. Op., at 14 (italics in original).

The City contends the new provisions added in Subsections (a), (b), (c) and (d) are vague and subjective, and would essentially allow Fire Fighters to make their own determinations as to what "unnecessarily endangers" the health or safety of a bargaining unit member. The City asserts these provisions also interfere with its management prerogatives. *See Int'l Ass'n of Fire Fighters, Local 669 v. City of Scranton*, 59 Pa.Cmwlth. 235, 429 A.2d 779 (1981) (fire fighter safety is not directly related to total size of fire fighter force, which is management prerogative not subject to collective bargaining).

■ In response, the Union acknowledges Section II–B(7) of the Plan ("*Elimination of Minimum Manning*") applies to the former 150 fire fighter floor for the entire bargaining unit complement. However, the number of fire fighters per station or per piece of equipment, or deployed to a fire, are all safety concerns which are arbitrable. *See Int'l Ass'n of Fire Fighters, Local 669* (safety of a fire fighter is far more rationally related to the number of persons fighting a fire with him); *City of*

*Erie v. Int'l Ass'n of Firefighters, Local 293*, 74 Pa.Cmwlth. 245, 459 A.2d 1320 (1983) (number of fire fighters assigned to each fire-fighting rig is an arbitrable work condition rather than a matter of managerial prerogative).

Fire Fighters further contend nothing in the 2002 Recovery Plan prohibits the additional language in the 2008 Award providing that Fire Fighters will not be *unnecessarily endangered* in the performance of their duties. Therefore, these safety provisions of the 2008 Award must be affirmed.

### b. Analysis

#### i. Sections (4)(1)–(5) of the 2008 Award

Our decision in *Scranton Fire Fighters (2009)* is controlling as to the Fire Fighter Safety provisions in Sections 4(1)–(5) of the 2008 Award, which are nearly identical to those in Sections 4(1)–(5) of the 2006 Award.[16] As noted in *Scranton Fire Fighters (2009)*, the 2006 Award's requirement in Sections 4(1)–(3) that the City provide a minimum of three fire fighters on each engine company, truck company and rescue unit is consistent with Section II–B(1) of the Plan's *"Provisions Specifically for the Fire Department,"* titled *"Organization and Scheduling,"* which provides in part: "Except for the Assistant Chief and his driver, *the City shall provide for a minimum of three firefighters on each piece of responding fire apparatus."* R.R. at 488a (emphasis added).

However, Section 4(4) of the 2008 Award, which requires the City to man a combination ladder and engine apparatus, known as a "Quint," with at least five personnel, and Section 4(5) of the Award, which requires the City, if it closes more

than three companies at the same time, to increase the minimum manpower for each engine, truck and rescue unit from three to four personnel, both exceed the three-person minimum staffing requirement for each apparatus in the *"Organization and Scheduling"* provision and the *"Elimination of Minimum Manning"* provision. *Scranton Fire Fighters (2009).*

Moreover, in accordance with our Supreme Court's recent guidance, we supplement our previous analysis with that set forth in *IAFF Local 22* and *Ellwood City*. First, we determine that Sections 4(4), (5) of the 2008 Award, which deal with fire fighter safety, implicate a topic rationally related to the terms and conditions of employment, which are the subject of collective bargaining under Act 111. *City of Erie*. Second, we conclude that the subject of minimum manning also implicates a non-bargainable managerial prerogative under the express terms of the 2002 Recovery Plan, especially as the subject relates to the overall budget and the organizational structure. *IAFF Local 22; Ellwood City.*

Finally, we conclude the restricted breadth of Section 4(4) of the 2008 Award, which addresses minimum manning of a "Quint," does not unduly infringe on the managerial prerogatives related to overall budget and organizational structure. However, the broader reach of Section 4(5), which applies to minimum manning should the City close multiple stations at the same time, unduly interferes with managerial prerogatives related to overall budget and organizational structure. Accordingly, although both provisions violate the terms of the 2002 Recovery Plan, only Section 4(5) unduly interferes with the City's managerial prerogatives. There-

---

**16.** As noted above, the arbitration panel issued the 2008 Award in November, 2008, prior to the January, 2009 filing date of our decision in *Scranton Fire Fighters (2009).*

fore, only Section 4(5) of the 2008 Award will be voided. *Id.*

### ii. 2007 Staffing Levels

■ The 2008 Award also provides, "nothing herein shall require the City to staff any piece of apparatus with more, nor shall anything herein authorize the City the [sic] staff each apparatus with less, [sic] manpower than that level of manpower that staffed each piece of apparatus as of December 31, 2007." 2008 Award, Maj. Op., at 14. To the extent this provision requires the City to exceed the minimum three-person staffing requirement for each piece of responding apparatus, it violates Section II–(B)(7) of the Plan (*"Elimination of Minimum Manning"*). Consistent with our approach in *Scranton Fire Fighters (2009)*, we should modify the common pleas court order to bring this provision into compliance with the 2002 Recovery Plan.

Supplementing our prior approach with an analysis based on our Supreme Court's recent guidance in *IAFF Local 22* and *Ellwood City*, we reach the same conclusion. Although the topic of minimum manning of each piece of apparatus is subject to bargaining, it is also a matter impacting managerial prerogatives related to the overall budget and organizational struc-ture. Because of its potential broad reach, we conclude that the "apparatus staffing" provision of the 2008 Award unduly interferes with managerial prerogatives and should be voided.

### iii. Added Sections 4(a)-(d) of the 2008 Award

The new *"Fire Fighter Safety"* provisions in Sections 4(a)-(d) of the 2008 Award: proscribe the City from requiring a bargaining unit member to perform any duty that unnecessarily endangers the member's health or safety beyond those dangers and risks unavoidably inherent in their position; require the City to abide by all federal, state and local laws and regulations regarding working conditions that would otherwise apply to a private sector employer; and, proscribe the City from requiring a fire fighter to utilize a City vehicle that would not pass a state inspection.

■ Section 4(a), which proscribes the City from requiring a bargaining unit member to perform any duty that unnecessarily endangers the member's health or safety beyond those dangers and risks unavoidably inherent in their position, contains language similar to that added by this Court in *Scranton Fire Fighters (2009)*.[17] The City fails to explain a func-

17. *See Scranton Fire Fighters (2009)*, 964 A.2d at 493 (if the City determines to merge an engine company and a truck company into a combination ladder and engine apparatus known as a Quint, it shall be staffed with such personnel as the City, in its discretion and after consultation with Fire Fighters, shall determine; *in making this determination, the City shall not unreasonably or arbitrarily endanger Fire Fighters' safety or health* ); *id.* at 494 (if the City closes more than three companies at the same time, the minimum staffing per apparatus, the City may, in its discretion and after consultation with Fire Fighters, increase minimum staffing per apparatus from the three to four personnel; *in making this determination, the City shall not unreasonably* or arbitrarily endanger Fire Fighters' safety or health* ); *id.* (emphasis added) (the City shall have the right, after consultation with Fire Fighters, to determine and change job duties for each position, to determine and change schedules for each employee, and the right to assign work to any employee; *in exercising these managerial rights, the City shall not unreasonably or arbitrarily endanger Fire Fighters' safety or health* ).

This language is identical to language in the 2006 Award in *Scranton FOP (2009)*, added by the arbitrators. *See Scranton FOP (2009)*, 965 A.2d 359, 372–73 n. 16, Paragraph E. Therefore, both the Fire Fighters and the FOP have the same language in their ultimate awards.

tional difference between the language in Section 4(a) and the similar language added to 2006 Award in *Scranton*. We therefore hold Section 4(a) does not violate the Plan.

 In addition, the City fails to explain how Section 4(c) (city shall abide by all federal, state and local laws and regulations regarding working conditions that would otherwise apply to a private sector employer); and Section 4(d) (City shall not require Fire Fighters to utilize a City vehicle that would not pass a State inspection) infringe on its managerial rights protected by the Plan. We thus hold Sections 4(c) and 4(d) do not violate the 2002 Recovery Plan.

 However, Section 4(b) (under no circumstance shall City unnecessarily endanger the health and safety of a bargaining unit member by subjecting the member to a managerial or physical condition the City could have anticipated or prevented by the expenditure of moneys or other City action) expressly mentions managerial conditions and the expenditure of funds. Clearly, it unduly interferes with the City's managerial rights involving overall budget as well as the express managerial rights protected by the 2002 Recovery Plan. *IAFF Local 22; Ellwood City; Scranton Fire Fighters (2009)*. Therefore, because Section 4(b) of the 2008 Award impermissibly infringes on the City's managerial rights under both Section II–B(1) of the Plan (*"Management Rights"*) and Section II–B(1) of the Plan's *"Provisions Specifically for the Fire Department,"* (*"Organization and Scheduling"*), Section 4(b) must be deleted from the 2008 Award. *IAFF Local 22; Ellwood City; Scranton Fire Fighters (2009)*. Accordingly, the common pleas court order is so modified.

#### iv. Managerial Rights

 Finally, we note the 2008 Award, like the 2006 Award, does not permit the City to determine and change job duties for each position, to determine and change schedules for each employee, and to assign work to any employee, as expressly required by Section II–B(1) of the Plan (*"Management Rights"*). These are managerial prerogatives. *IAFF Local 22; Ellwood City; Scranton Fire Fighters (2009)*. The 2008 Award unduly interferes with them by failing to adopt the clear provisions in the 2002 Recovery Plan on the topic. Therefore, we modify the common pleas court's order to add the operative language from this provision to the 2008 Award.

#### 4. Mandatory Cost Containment Provisions

##### a. Contentions

Also citing *Scranton Fire Fighters (2009)*, the City contends Section II–B of the 2002 Recovery Plan includes extensive cost containment measures set forth in Sections II–B(6) and (8) through (21) which apply to all employees. As discussed above, in *Scranton Fire Fighters (2009)* we determined the 2006 Award violated the Plan "by failing to include Sections II–B(6) and (8) through (21), inclusive." *Id.* at 488. In *Scranton Fire Fighters (2009)*, we recognized "[t]he Recovery Plan specifically states 'to the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that the implementation of these cost containment provisions is mandatory.'" *Id.* (citation omitted).

Presently, the City contends the arbitration panel majority in the 2008 Award did not account for the inclusion of Sections II–B(6) and (8) through (21) of the Plan in

the 2008 Award. As a result, the parties were not able to bargain with the knowledge that a successor CBA or arbitration award must include these provisions. Thus, neither party could address the ramifications of these provisions to the award or CBA as a whole. Therefore, the City argues the 2008 Award was fatally flawed due to its failure to include the mandated cost containment provisions and to use them as a basis for the 2008 Award.

#### b. Analysis

In light of *Scranton Fire Fighters (2009)*, this Court modifies the common pleas court's order here to include the mandatory cost containment provisions in Sections II–B(6) and (8) through (21) of the Plan in the 2008 Award. Further, as discussed below, although the City contends the 2008 Award must be vacated because the panel majority failed to consider these mandatory provisions, we believe a remand to the divided arbitration panel would be futile. Sufficient modifications can be made to the 2008 Award to bring it into compliance with the 2002 Recovery Plan and move this controversy to the next level.

#### 5. Pension Benefits

#### a. Contentions

The City next contends that the *"Employee Benefits/Pensions"* provision in Chapter II–C of the Plan (General Plan Provisions) mandates that any pension plan amendment must comply with the requirements of Act 205 ("Municipal Pension Funding Standard and Recovery Act"), and must be in accord with the cost containment provisions in Chapter II–B of the 2002 Recovery Plan. *See* R.R. at 502a.

Chapter 3 f Act 205 governs minimum funding standards for municipal pension plans. *See* 53 P.S. §§ 895.301–895.307. Compliance with Act 205 is man-

datory. Section 301 provides (with emphasis added):

(a) **Application.**—Notwithstanding any provision of law, municipal ordinance, municipal charter, pension plan agreement or pension plan contract to the contrary, *the applicable provisions of this chapter shall apply to any municipality which has established and maintains, directly or indirectly, a pension plan for the benefit of its employees,* irrespective of the manner in which the pension plan is administered, and to the respective pension plan.

53 P.S. § 895.301(a). Thus, in the event of an actual conflict between Act 205 and a pension plan modification in a CBA, the requirements of Act 205 must be given effect. *Borough of Ellwood City v. Ellwood City Police Dep't Wage & Policy Unit,* 573 Pa. 353, 825 A.2d 617 (2003). Act 205 also applies to pension plan modifications in Act 111 arbitration awards. *Shippensburg Police Ass'n v. Borough of Shippensburg,* 968 A.2d 246 (Pa.Cmwlth. 2009); *Upper Merion Twp. v. Upper Merion Twp. Police Officers,* 915 A.2d 174 (Pa.Cmwlth.2006); *Northampton Twp. v. Northampton Twp. Police Benevolent Ass'n,* 885 A.2d 81 (Pa.Cmwlth.2005).

Sections 302(b) and (c) of Act 205 require an annual determination of the financial requirements of a municipal pension plan for the following year and describe how the municipality's minimum obligation (MMO) with respect to the pension plan is to be determined. 53 P.S. §§ 895.302(b) and (c). A Section 302 actuarial report must demonstrate that the pension plan is actuarially sound in order for the municipality to determine the impact of the proposed modification on the pension plan's minimum funding requirements. *Ellwood City Police Dep't; Erie v. Int'l Ass'n of Firefighters, Local 293,* 836

A.2d 1047 (Pa.Cmwlth.2003). Section 302(d) requires that the municipality annually provide for the full amount of the MMO in its budget. 53 P.S. § 895.302(d).

Section 305 of Act 205, which requires an actuarial cost estimate for *any* benefit plan modifications, provides in part (with emphasis added):

(a) **Presentation of cost estimate.**— *Prior to the adoption of any benefit plan modification* by the governing body of the municipality, *the chief administrative officer of each pension plan shall provide to the governing body of the municipality a cost estimate of the proposed benefit plan modification.*

(b) **Defined benefit plan.**—If the pension plan is a defined benefit plan which is self-insured in whole or in part, the cost estimate shall be prepared by an approved actuary and shall either be the updated actuarial exhibits of an actuarial valuation report specified in Chapter 2 or an estimate of the expected actuarial impact attributable to the proposed benefit plan modification.

\* \* \*

(e) **Contents of cost estimate.**—*Any cost estimate of the effect of the proposed benefit plan modification shall be complete and accurate and shall be presented in a way reasonably calculated to disclose to the average person comprising the membership of the governing body of the municipality, the impact of the proposed benefit plan, the modification on the future financial requirements of the pension plan and the future minimum obligation of the mu-*

*nicipality with respect to the pension plan.*

53 P.S. § 895.305(a), (b) and (e).

In *Shippensburg*, 968 A.2d at 251, this Court held "a grievance arbitrator who awards a modification of a police pension plan in the absence of an Act 205 cost estimate requires an illegal act necessitating vacation." Because the record in *Shippensburg* contained no Act 205 cost estimate, the Court determined the arbitrator exceeded his authority in awarding the pension modification. *See also Northampton Twp.* (Act 111 awards modifying police pension plans must be made in compliance with Act 205).

The City asserts the record here lacks any evidence of compliance with the specific requirements of Act 205. The record does not contain a "complete and accurate" cost estimate or actuarial report, prepared or approved by the City's pension plan administrator (Plan Administrator)[18] regarding the impact of the proposed maximum pension benefit increases, whether to 50% or 70% of average salary.[19] In addition, there is no evidence regarding the significant impact of including "all longevity, overtime and other pay incentives" as part of the salary on which the pension benefit would be based.

Moreover, Fire Fighters' cost study, relied upon by the arbitration panel majority, indicated that the City's estimated contribution for the proposed modification to 70% of average salary at 25 years (70% option) would increase from $693,788 for the current plan to $1,302,904 for the proposed modification. *See* R.R. at 329a. Similarly, the City's estimated MMO for

---

18. The City notes its pension plans are governed by a Pension Board with elected members from each of the City's unions. The Plan Administrator is Thomas J. Anderson and Associates, Inc., (Anderson) which is not a City employee. Anderson is an independent mu-

nicipal pensions consultant that specializes in pension administration.

19. The City notes the existing maximum pension benefit is 50% of average salary. *See* City's Br. at 31.

the 70% option would rise from $1,636,467 for the current plan to $2,245,583 for the proposed modification. *Id.*

Further, Fire Fighters' witness, its own actuary, presented no evidence that the City's pension plan was actuarially sound or that it would remain sound despite the proposed modification. In fact, his report focused solely on the actuarial cost impact of the proposed pension amendments. He did not relate the costs he estimated to the soundness of the plan. He also failed to address the City's future MMO as Act 205 requires, and whether it exceeds the $800,000 MMO cap that Section II–C of the 2002 Recovery Plan describes.

Therefore, the City argues, the arbitration panel's determination, without any form of legitimate cost study, that the increased benefits would have an acceptable limited impact, is not supportable under Act 205. Rather, it has the effect of requiring an illegal act. *Shippensburg.* Given the absence of any evidence required by Act 205, the City contends the common pleas court erred in failing to vacate the 2008 Award.

In addition, the City argues the 70% option violates Section 1(b) of the 1951 Municipal Pension Act, 53 P.S. § 30495(b) (minimum pensions and cost of living increases for police officers and fire fighters in certain cities), which limits the maximum pension benefit for a fire fighter in a city of the second class A to 50% of the salary currently paid to a fire fighter of the highest pay grade. Section 1(d) of that act provides that retirement allowance increases shall not be granted unless the pension systems are actuarially sound and able to maintain the increases. 53 P.S. § 30495(d).

In response, Fire Fighters contend they provided the actuarial evidence required by Section 305(b) of Act 205, for a defined benefit plan. *See* City of Scranton Fire-

men's Pension Plan Actuarial Cost Study as of January 1, 2007. R.R. at 325a–29a.

Citing Section 305(b) of Act 205, the Union claims its actuarial documentation and testimony justified the increases in pension benefits. The Union further asserts its actuarial data addresses all the requirements of 53 P.S. § 895.305(e).

Fire Fighters further argue the $800,000 "cap" referred to in the *"Employee Benefits/Pensions"* provision in Chapter II–C of the 2002 Recovery Plan is not a cap on the City's MMO, but rather the amount per year to pay back a loan by Provident Mutual to cover earlier unfunded MMOs. Even assuming it is a cap, Fire Fighters contend its actuarial data shows that none of the pension improvement scenarios, either the 70% option or the 50% option, increase the City's MMO beyond $800,000.

### b. Analysis

#### i. Illegality

There are three reasons why the modifications to the pension plan must be vacated. First and foremost, Scranton, a Class 2–A city, is limited to a total pension allowance of 50% of the salary currently paid to a patrolman or fireman, highest pay grade. 53 P.S. § 30495(b). As the common pleas court determined, the 2008 Award violated 53 P.S. § 30495(b) by allowing a pension up to 70% of average salary.

Fire Fighters do not dispute the Award is illegal in this respect; rather, they argue the City waived its legality argument by failing to assert it before the arbitrators. This argument is totally lacking in merit. *Chirico v. Bd. of Supervisors of Newton Twp.*, 504 Pa. 71, 470 A.2d 470 (1983) (arbitrators may not mandate an illegal act; courts may not enforce provision of interest arbitration award without a determination of legality; no basis to apply

equitable principle of estoppel); *Lee v. Mun. of Bethel Park*, 722 A.2d 1165 (Pa. Cmwlth.1999) (where there is an interest arbitration award, an employer may subsequently assert the illegality of a provision because it did not have an opportunity to do so during the bargaining process; as such, no principles of estoppel existed).

### ii. Act 205–Plan Administrator

■ Second, we conclude Fire Fighters failed to comply with the cost estimate requirements in Section 305 of Act 205. Fire Fighters presented a four-page actuary report, together with supporting testimony. The report showed the current plan with approximately *50% unfunded liability* of $32,421,069. R.R. at 329a. Nevertheless, Fire Fighters' actuary assumed the City could afford the increase in its estimated MMO from $1,636,467 to $2,245,583, and the estimated City contribution from the current $693,788 to $1,302,904 under the 70% option. *Id.* at 326a–29a. The modification increased the percentage of unfunded liability. *Id.* Fire Fighters' actuary declined to offer any opinion about the legality of the proposed modifications to the pension plan. *Id.* at 327a.

In contrast, the City presented the testimony of Randee W. Sekol (Actuarial Consultant), the current actuarial consultant to the pension plan. Actuarial Consultant opined that the cost estimates of Fire Fighters' actuary were understated because his assumptions for retirement age were not consistent with experience. *Id.* at 70a–71a. He also stated that if the plan were a multi-employer plan, it would be considered in critical status, which would mean the plan's sponsor would have to start taking steps under penalty of law to get a better funding position. *Id.* at 94a.

Section 305(a) of Act 205 requires the presentation of a cost estimate for benefit plan modification by the *chief administrative officer* of each pension plan. Section 102 of Act 205, defines **"chief administrative officer"** as "[t]he person who has primary responsibility for the execution of the administrative affairs of the municipality in the case of a municipality, or of the pension plan in the case of a pension plan, or the designee of that person." 53 P.S. § 895.102 (bolding in original). In short, pursuant to Section 305 of Act 205, while the cost estimate itself for a defined plan can be prepared by "an approved actuary," it is clear that the "chief administrative officer" must be involved in the cost estimate/modification process. 53 P.S. § 895.305.

This requirement makes sense. The chief administrative officer is in the best position to approve the actuary and to assess the completeness, accuracy, transparency and legality of the cost estimate. This is especially true where, as here, the proposed modification violates a statute. Further, a review of Fire Fighters' cost estimate and supporting testimony here raises questions as to whether "[the cost estimate is] presented in a way reasonably calculated to disclose to the average person comprising the membership of the governing body of the municipality the impact of the proposed benefit plan, the modification on the future financial requirements of the pension plan and the future minimum obligation of the municipality...." *See* Section 305(e) of Act 205, 53 P.S. § 895.305(e); R.R. at 32a–37a (testimony of Fire Fighters' actuary).

Because Fire Fighters did not present any evidence from Plan Administrator, their cost estimate procedures do not comply with Section 305(a) of Act 205. Indeed, the City presented the only evidence from a witness involved in the current pension plan, and that witness disputed Fire Fighters' proposal. As a result of

this failure to comply with Act 205, the awarded modifications in retirement benefits dependent on the cost estimate must be vacated. *Shippensburg.* We therefore modify the common pleas court order to delete the "Pension Benefit" provisions in Section 7 of the 2008 Award.

### iii. Act 205–Cost Estimate

Third, the Fire Fighters' cost estimate does not clearly address the actuarial soundness of their pension plan after the proposed modifications. Given the existing *50% unfunded liability* of $32,421,069, and the increase in the unfunded liability under the Fire Fighters' proposals, this was a fatal omission. *See IAFF Local 293.*

In addition, Fire Fighters' cost estimate only addresses the proposed 70% modification in the pension plan. The cost estimate does *not* address another modification approved by the panel majority: calculation of average year salary based on W–2 income, which includes longevity, overtime and other pay incentives.

The City argues that this other pension plan modification should be vacated because it is not supported by any cost estimate. The Fire Fighters respond that they presented testimony from their actuary that the change had little actuarial impact, and this testimony was accepted by the panel majority. See R.R. at 36a–37a.

We agree with the City's position on this additional issue. Because the Fire Fighters' cost estimate does not address this proposed modification, its adoption in the 2008 Award is an illegal act. *Shippensburg.* Moreover, the testimony supporting this modification is opaque at best. As a result, the testimony violates the Act 205 requirement that the cost estimate for modification be presented in such a way as to reasonably disclose to the average person its impact. For these additional rea-

sons we modify the common pleas court order to vacate the "Pension Benefit" provisions in Section 7 of the 2008 Award.

### 6. Vacation of Entire Award

#### a. Contentions

The City next contends that because the 2008 Award is contrary to this Court's decisions in *Scranton Fire Fighters (2009)* and *Scranton FOP (2009)*, it must be vacated in its entirety. Further, the 2008 Award assumed restoring Fire Fighters to "parity" with fire fighters in similarly sized cities was more important than Act 47's goal of restoring the City to fiscal integrity. In short, the majority of the arbitration panel proceeded as if compliance with the 2002 Recovery Plan was optional.

As a result, vacating the 2008 Award in its entirety, with a clear direction of compliance with this Court's mandates, is the only means to ensure a new award complies with the controlling law. The City notes vacating the 2008 Award is analogous to vacating a jury verdict where the jury was charged with the incorrect law, thus depriving the jury of the essential guidance to decide the case.

The City further argues the common pleas court's piecemeal modification of the 2008 Award failed to vacate or modify other provisions of the Award that violate, expand or diminish the 2002 Recovery Plan. Therefore, the City contends it is essential to fully vacate the 2008 Award. For example, although the common pleas court eliminated the additional mid-year increases, it did not attempt to reconcile those increases with the increases ultimately allowed in *Scranton Fire Fighters (2009)*. Thus, it is unclear as to what base wages the 8% increase for 2008 is to be based. The common pleas court also allowed increases in health care costs without considering the increases in health

care costs allowed in *Scranton Fire Fighters (2009)*.

As to the pension improvements, the common pleas court essentially ignored Act 205's mandatory requirements regarding an assessment of the costs of those benefits, and failed to consider the 2002 Recovery Plan's $800,000 cap on the City's MMO. The common pleas court also made no attempt to evaluate the cost effect of the 2008 Award's inclusion of longevity, overtime and other pay incentives as part of the salary base for calculating the pension benefit.

In addition, simply tacking the 2002 Recovery Plan's cost containment provisions onto the 2008 Award, which disregarded them, would not cure the 2008 Award's deficiencies. Therefore, the 2008 Award must be vacated in its entirety.

In response, Fire Fighters counter that the common pleas court may modify an arbitration award where the arbitration panel exceeds its authority. Uniform Arbitration Act, 42 Pa.C.S. §§ 7301–20; *Scranton Fire Fighters (2009)*. Further, this Court may modify the orders of the trial court. 42 Pa.C.S. § 706; *Scranton Fire Fighters (2009)*.

Here, Fire Fighters assert that the 2008 Award's provisions regarding wages and health insurance do not violate the 2002 Recovery Plan or Section 252 of Act 47. Therefore, there is no reason for vacating those provisions.

#### b. Analysis

■■■ Because the parties, or at least their lawyers, are bitterly divided and appear incapable of reaching any agreement, vacating the entire award and remanding to the same arbitration panel would only postpone the inevitable appeals.

In addition, it may require significant time to reach a new award on remand.

Given our application of the 2002 Recovery Plan prohibition against retroactive adjustments, this delay could result in the loss of wage increases. This possible result would be prejudicial to the Fire Fighters, and it is an additional reason supporting our exercise of discretion.

In *Scranton Fire Fighters (2009)*, we made sufficient modifications to the common pleas court's orders to bring the 2006 Award into compliance with the 2002 Recovery Plan and to move the controversy to the next level. The same approach is appropriate here.

#### 7. Remaining Issues

#### a. Constitutionality of Act 47

#### i. Contentions

We next address Fire Fighters' contention that Act 47 is unconstitutional on its face or as applied by the common pleas court. In this argument, Fire Fighters acknowledge the Supreme Court in *Wilkinsburg II* held that Act 47 was constitutional as it did not unconstitutionally delegate a municipality's fiscal authority and was not a special law regulating labor. However, Fire Fighters assert, *Wilkinsburg II* was a plurality decision and these issues are ripe for reconsideration.

Fire Fighters argue Act 47 contains several provisions that run afoul of Article III, Section 31 of the Pennsylvania Constitution (Delegation of certain powers prohibited), which provides:

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise, or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever. Notwithstanding the foregoing limitation or any other provision of the Constitution,

the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlements of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties and shall constitute a mandate to the head of the political subdivision which is the employer ... and to the lawmaking body of such political subdivision ... with respect to matters which require legislative action, to take the action necessary to carry out such findings.

In particular, Fire Fighters argue Section 248, 53 P.S. § 11701.248 (failure to adopt or implement plan); Section 251, 53 P.S. § 11701.251 (withholding of Commonwealth agency payments or assistance); and Section 264, 53 P.S. § 11701.264 (suspension of Commonwealth funding) operate in a way that mandates compliance with plans developed by DCED or its agents. As a result, these sections of Act 47 violate Article III, Section 31 of the Pennsylvania Constitution.

Further, Fire Fighters argue Section 252, 53 P.S. § 11701.252 (CBA or arbitration agreement may not in any manner violate, expand or diminish a preexisting Act 47 recovery plan) violated the prohibition in Article III, Section 32(7) of the Pennsylvania Constitution prohibiting special laws regulating labor.

### ii. Analysis

These precise arguments were rejected by this Court in *Wilkinsburg I.* Regardless of the effect of Supreme Court's plurality decision in *Wilkinsburg II,* our decision in *Wilkinsburg I* continues to bind this Court as to the constitutionality of Act 47.

In any event, we recognize that in *Scranton Fire Fighters,* —— Pa. ——, 995 A.2d 1180 (2010), the Supreme Court decided to revisit the issues of whether Section 252 of Act 47 applies to Act 111 interest arbitration awards and, if it does, whether a recovery plan promulgated under Section 252 must be "consistent with applicable law" that recognizes binding arbitration and the right to bargain pursuant to Act 111. *Id.* at ——, 995 A.2d at 1180–81.

### b. Other Issues

Fire Fighters, for the purpose of preservation for further appellate review, raise other related issues previously addressed and rejected in *Scranton Fire Fighters (2009).* These issues include: whether the common pleas court erred in concluding that Section 252 of Act 47 applies to interest arbitration awards, as opposed to "agreements" or "settlements," as stated in the statute; whether, even assuming Section 252 applies to "awards," a recovery plan must still conform with applicable law regarding mandatory subjects of Act 111 collective bargaining; whether the common pleas court erred when it eliminated retiree health benefits for employees who were already vested with those benefits; whether the City can voluntarily amend the 2002 Recovery Plan to bring the 2008 Award in compliance with the Plan, or alternatively, whether an Act 111 interest arbitration award is a mandate to the lawmaking body of the City compelling legislative action such as amendment of the Plan; whether the City's "unclean hands" in its own failure to comply with many sections of the 2002 Recovery Plan precludes it from seeking enforcement of the Plan in this proceeding; and, whether even if Commonwealth Court concludes the 2008 Award is in violation of the 2002 Recovery Plan, the matter should be remanded to the arbitration panel.

These issues were addressed and rejected in *Scranton Fire Fighters (2009)*. In accord with our previous decision, we again reject Fire Fighters' contentions. With the exception of the "unclean hands" argument, these issues are essentially all before the Supreme Court in *Scranton Fire Fighters (2009)*.

## V. Conclusion

For all the reasons discussed, we affirm the common pleas court's order, as modified, consistent with the foregoing opinion.

Judge McCULLOUGH did not participate in the decision in this case.

### ORDER

**AND NOW**, this 29th day of October 2010, the order of the Court of Common Pleas of Lackawanna County, entered November 18, 2009 is **AFFIRMED as MODIFIED**. In particular, the arbitration award effective November 19, 2008, is modified as follows (with deletions stricken and additions underlined):

1. *Term*

The modified contract shall be for a term of seven years, starting on January 1, 2008 and continuing through December 31, 2014.

2. *Wages*

The Panel recognizes that, as a result of the previous interest arbitration award being in a state of limbo because of the various appeals, the men and women of this bargaining unit have not received a wage increase since January 2002, and that one-third of this bargaining unit has never had a wage increase of any sort.

The Panel notes that the Revised Recovery Plan contains no recommendations, binding or otherwise, concerning wages for any period beyond 2005. As a consequence, a majority of the Panel is convinced that it has the authority to address the matter of wages limited only by its sound judgment based upon the evidence presented.

In this regard, the Panel notes that prior to Scranton's being declared "distressed," the men and women of this bargaining unit received wages that were seven percent above the average of comparable third class cities and surrounding communities. As a result of the significant concessions voluntarily made by the men and women of this bargaining unit as a result of the City's distressed status, the average wage for a Scranton fire fighter had dipped to 4% below the average by January 2002—the date of the last wage increase enjoyed by the employees of this department. Since that time, of course, there has been a "wage freeze," which, as a result, now find [sic] the employees of this unit earning a mere 78% of the *average* salary enjoyed by fire fighters in comparable departments—an 18% decrease since 2002, and a decrease just shy of 30% from the 1992 average figure.

During this period, however, the duties of the men and women of this department have not diminished. To the contrary, as a result of a 25% decrease in manpower in 1991—but with no plan in effect to adequately address this decrease, the members of this department have found their responsibilities increasing, but with lesser manpower to meet those responsibilities. The evidence shows that, during that period, the performance of the department has remained exemplary, and has found one member of the department paying the ultimate price.

While the Panel is aware that the City still remains distressed, it also finds that the City has made considerable economic progress over the past few years, and

has finished in the black for several years in a row, enjoying unreserved fund balances during that period. The Panel also notes that, while the members of this bargaining unit have found their wages frozen, the City has given significant wage increases to a number of managerial employees, with new, highly-paid positions also being created during this recovery "cycle." Indeed, the Fire Chief has received considerable wage increases since 2002.

Based on the above, a majority of the Panel is convinced that the time is appropriate to return to members of this bargaining unit to [sic] the historical parity they traditionally enjoyed, both pre-recovery and even during the recovery period prior to 2003. Accordingly, the Panel orders the wage increases set forth as follows:

- ~~January 1, 2008~~ November 19, 2008—8% increase across the board;
- January 1, 2009—3.0% increase across the board;
- July 1, 2009—3.0% increase across the board;
- January 1, 2010—3.0% increase across the board;
- July 1, 2010—3.0% increase across the board;
- January 1, 2011—3.0% increase across the board;
- July 1, 2011—3.0% increase across the board;
- January 1, 2012—3.0% increase across the board;
- July 1, 2012—3.0% increase across the board;
- January 1, 2013—3.2% increase across the board;
- July 1, 2013—3.2% increase across the board;
- January 1, 2014—3.2% increase across the board;
- July 7, 2014—3.2% increase across the board.

A majority of the Panel finds that, in the absence of any express recommendations in any Revised Recovery Plan for the above years, the increases awarded here do not expand or diminish a Plan. A majority of the Panels [sic] also finds that these increases are within the spirit of any Plan, as they take into account the City's ability to pay as evidenced by the record as a whole.

The Panel recognizes that, should any of the wage increases of the 2003–2007 interest arbitration award issued by this Panel ultimately be confirmed, the net effect will be that the members of this bargaining unit will *not* have had to endure a six-year wage freeze. Should this happen, the Panel wishes to avoid a "windfall" as a result. Accordingly, should any of the wage increases of the 2003–2007 Award ultimately be reinstated and confirmed the wage increases stated above for this bargaining unit will be reduced on a percentage or, part of a percentage basis, accordingly and the reduction shall be spread evenly over the entire term of this Award.

Absent any confirmation of wage increases awarded in the 2003–2007 Award, the wage increase schedule above shall remain in full force and effect for the duration of this new contract.

3. *Health Insurance*

The Panel is aware that health care costs continue to be a serious issue for the City. In this connection, the Revised Recovery Plan states that the City's share of health care expenses shall not exceed the total cost for health care in 2001. However, the Plan contains no binding recommendation concerning how that total is the be [sic] apportioned among the various bargain-

ing units, and the City presented no reliable evidence demonstrating how the 2001 number was reached, or just what its current costs are.

In light of the above, and taking into consideration the evidence as a whole, the Panel awards as follows:

A. The City is ordered to fully cooperate with the Health Care Committee by providing all information reasonable [sic] necessary to its function and by cooperating with the National Health Care Consultant in the Committee's efforts to contain health care costs.

B. Effective 30 days after the issuance of this Award, the applicable deductibles and/or copayments shall be adjusted as follows:

1. The maximum individual annual deductible under the medical insurance plan shall be increased from $200 to $400 for in-network and out-of-network.

2. The maximum family annual deductible shall be increased from $400 to $800 for in-net work and out-of-network.

3. The per-visit emergency room co-pay shall be increased from $35 to $75.

4. The per-visit doctor co-pay shall be increased from $5 to $10.

5. The co-payment for the prescription plan shall be increased to $6 for generics and $15 for brand name drugs.

C. Article XV, Sections 3(A) and (B) of the collective bargaining agreement shall be amended as follows:

1. Effective January 1, 2008, the City shall be liable for the cost of health insurance (over and above the listed deductibles and co-payments) up to the annual amounts listed below:

| | 1/1/08 | 1/1/11 | 1/1/12 | 1/1/13 |
|---|---|---|---|---|
| Single [Cov.] | $ 4,430 | $ 5,316 | $ 6,380 | $ 7,656 |
| Parent/Child | $ 8,758 | $10,509 | $12,611 | $15,133 |
| Parent/Children | $ 9,443 | $11,331 | $13,598 | $16,317 |
| Husband/Wife | $11,113 | $13,336 | $16,003 | $19,204 |
| Family | $11,920 | $14,304 | $17,164 | $20,597 |

2. As of January 1, 2008, the City shall be responsible for 50% of any increases in the cost of health care for active bargaining unit employees beyond that provided above and the active employees shall be responsible for the balance of any subsequent increases as determined by the healthcare provider.

D. Retiree Health Insurance shall be amended as follows: Effective January 1, 2008, all bargaining unit members who thereafter retire and are eligible to receive retiree health insurance under the 1996–2002 Agreement shall continue to be eligible to receive insurance for a period of 10 years following the bargaining unit member's retirement. Effective January 23, 2009, the City will cease to extend health care benefits to employees who retire on or after that date.

A majority of the Panel is mindful of the City's distressed status, and takes particular note of the fact that, in the current climate, health care costs are a serious matter for all municipalities. However, based upon the evidence presented—most of it unrebutted by the City—a majority of the Panel finds that the above provisions, as modified, do not violate the City's maximum health care costs permitted under Section II–B of the Plan. In fact, a majority of the Panel is confident that, with an active Health Care Committee benefitting from the full and complete cooperation of the City, these costs will fall within the parameters established by the Plan.

4. *Fire Fighter Safety*

The Panel recognizes that the 150 fire fighter "floor" contained in the 1996–2002 collective bargaining agreement

cannot be continued without the agreement of the City. As the City made it clear that it would not so concur, the Panel acknowledges that the "floor" must be removed from the contract.

A majority of the Panel is convinced from the evidence of record that there is a direct and irrefutable connection between the lives and safety of the fire fighters and the number of personnel actually assigned to fire apparatus that the City determines to operate. In that regard, it would appear that the NFPA 1710 standards developed by a nationally-renowned body of experts to which the City belongs provides the scientifically-sound and persuasive guidance on this vital issue; indeed, the City appeared to acknowledge as much, as it made no attempt to rebut the Union's evidence on fire safety, and NFPA 1710 in particular.

In this regard, the Plan provides no binding recommendations to the Panel. The Revised Recovery Plan does state that any provision in the collective bargaining agreement "concerning minimum manning requirements for any particular bargaining unit, shift, platoon, job classification, specialization, or position shall be eliminated." [H]owever, the Plan does not state that there is any limitation on *per apparatus* staffing as, indeed, it could not, as such issues are mandatory subjects of bargaining as per the *[City of Erie v. Int'l Ass'n of Firefighters Local 293*, 836 A.2d 1047 (Pa. Cmwlth.2003) ] case.

Accordingly, the Panel directs the following as being the minimal necessary staffing to protect the safety and lives of the bargaining unit:

Effective immediately, the portion of Article XIX, Section 3 of the collective bargaining agreement that provides "[e]xcept as otherwise provided in this Agreement, the bargaining unit complement shall at all times be maintained at not less than One Hundred Fifty (150) bargaining unit members" and Article XIX, Section 4 and 5 regarding layoff shall be deleted and shall be replaced with the following language:

1. Each engine company maintained by the City shall be actually staffed on each shift with no less than three (3) personnel.

2. Each truck company maintained by the City shall be actually staffed on each shift with no less than three (3) personnel.

3. The Rescue Unit shall actually be staffed on each shift with no less than three (3) personnel.

4. If the City determines to utilize an apparatus as a Quint (a combination ladder and engine apparatus) and merges into a single engine company and single truck company into one Quint company, it shall actually be staffed with no less than five (5) personnel.

5. The number of pieces of apparatus and fire companies maintained by the City is left to its discretion. ~~However,~~ If the City temporarily or permanently closes more than three companies at the same time, the minimum manpower per apparatus provided above ~~shall~~ may be increased for engines, trucks and Rescue from three to four personnel as the City in its discretion shall determine after consultation with the fire fighters. In making this determination the City shall not unreasonably or arbitrarily endanger the safety or health of bargaining unit members. Although nothing in this provision shall nullify the City's obligation to pay overtime, this provision is neither intended to

create overtime or any other additional costs to the City. Rather, the sole purpose of this provision is to ensure that there is a safe level of manning at fires if the City temporarily or permanently closes more than three fire companies, and the provision is not intended to create a minimum number of fire fighters in the bargaining unit or require the City to hire additional fire fighters. Should the parties not agree on whether the City has closed a company, the panel named above shall make a determination whether it has been closed or not.

Notwithstanding anything to the contrary, nothing herein shall require the City to staff any piece of apparatus with more, nor shall anything herein authorize the City the [sic] staff each apparatus with less, [sic] manpower than ~~that level of manpower that staffed each piece of apparatus as of December 31, 2007~~ three fire fighters on each piece of responding fire apparatus.

In addition, the following language shall also be added to the collective bargaining agreement:

a. No member of the bargaining unit shall be required to perform any duty that *unnecessarily* endangers the health or safety of that member beyond those dangers and risks unavoidably inherent in their position.

b. ~~Under no circumstance shall the City *unnecessarily* endanger the health or safety of a bargaining unit member by requiring the bargaining unit member to be subjected to a managerial or physical condition that could have been anticipated and/or prevented by the City by the expenditure of moneys or other City action.~~

c. The City shall abide by all federal, state and local laws and regulations governing all aspects of the workplace and working conditions that would otherwise apply to a private sector employer. The terms and conditions of such laws are incorporated into the collective bargaining agreement as if fully set forth therein.

d. No fire fighter shall be required to utilize a City vehicle that would not pass a State inspection.

Again, a majority of the Panel finds that these provisions do not expand, violate or diminish the Revised Recovery Plan. Furthermore, a majority of the Panel finds that these provisions are in harmony with the managements [sic] rights provision contained in the Plan even assuming, *arguendo*, that said clause provided any binding recommendation beyond 2005.

**5. Rank Differential**

The record in this matter demonstrates that, besides being well behind the average in base wages, officers in the Scranton fire department have also had the "value" of their rank diminished as the result of other communities' having more substantial rank differentials. Again, a majority of the Panel finds that the Recovery Plan contains no binding recommendations on the issue of wages beyond 2005, and notes that substantial wage increases have been given to numerous non-represented employees, including the Fire Chief. Thus, the Panel awards as follows:

Article VIII(2) of the collective bargaining agreement shall be amended to provide that the base wage paid ranks above that of Private shall by current category be separated by four percent (4%).

**6. Life Insurance**

The face value of the life insurance policy provided to bargaining unit members shall be increased to twice the

yearly wage of the bargaining unit member.

A majority of the Panel finds that the Revised Recovery Plan is silent on this issue and, thus, contains no binding recommendation to advise the Panel.

~~7. *Pension Benefits*~~

~~The Panel finds that the Revised Recovery Plan is silent on the issue of pension benefits and, as a result, there are no recommendations in the Plan on this issue which are binding upon the Panel.~~

~~Based upon the actuarial testimony presented during the hearing, a majority of the Panel is convinced that the following provisions may be awarded without detrimentally effecting the actuarial soundness of the City's pension plans as a whole.~~

~~Accordingly, the Pension Plan shall be amended to provide for a normal person to be paid in the following amount of average annual salary:~~

| ~~Years of Service~~ | ~~Pct. of Average Year Salary~~ |
|---|---|
| ~~20 years~~ | ~~60 percent~~ |
| ~~21 years~~ | ~~62 percent~~ |
| ~~22 years~~ | ~~64 percent~~ |
| ~~23 years~~ | ~~66 percent~~ |
| ~~24 years~~ | ~~68 percent~~ |
| ~~25 years~~ | ~~70 percent~~ |

~~The calculation of average year salary shall include the longevity, overtime and other pay incentives. In this connection, a majority of the Panel notes that the City currently bases its contributions to the Plan on total compensation and agrees with the testimony of the Union's actuary that this change has little actuarial impact on the plan, and so finds as a matter of fact.~~

### 8. *QRS Program/Ambulance/Rapid Intervention Team Studies*

The City and the Union will convene a joint committee with equal City and Union representation to conduct a study of a QRS Program, Ambulance duties, and Rapid Intervention Team, regarding whether the City will expand its Fire Department to provide any or all of these services through the Fire Department to the City's citizens.

The Panel notes that the Revised Recovery Plan contains no binding recommendations on these issues.

### 9. *New Provisions*

1. Sections II–B (6), and (8) through (21), inclusive, of the 2002 Recovery Plan are incorporated by reference into this modified award.

2. The City shall have the right, after consultation with the fire fighters, to determine the organizational structure and operation of each Department including, but not limited to, the right to determine and change job duties for each position, the right to determine and change schedules for each employee, and the right to assign work to any employee. In the exercise of this right, the City shall not unreasonably or arbitrarily endanger the safety or health of bargaining unit members.

Except as modified by this Award, all other terms and conditions contained in previous awards and written agreements between the parties not modified by this Award shall remain as contained in the 1996–2002 collective bargaining agreement between the parties. If the 2003–2007 Award is upheld by the courts, all other items and conditions contained in the previous awards and written agreements between the parties not modified by this Award shall remain as contained in the 1996–2002 collective bargaining agreement as modified by the 2003–2007 Award.

All other proposals and requests for change submitted by the City and Union, which have not been addressed herein, were considered and denied.

With regard to the various items awarded or denied in this decision, the

arbitration panel may not have been in unanimous accord on each; however, at least a majority of the arbitration board has concurred with each awarded item and to the denial of any others not included in this Award.